Argued and submitted March 9, reversed and remanded August 24,
petitioner's and respondent's reconsiderations denied October 29,
petitions for review denied November 24, 1981 (292 Or 109)

## BRITTON,
### *Petitioner,*
*v.*
## BOARD OF PODIATRY EXAMINERS,
### *Respondent.*

(CA 18774)

632 P2d 1273

John R. Faust, Portland, argued the cause for petitioner. With him on the brief were A. Allan Franzke, and Schwabe, Williamson, Wyatt, Moore & Roberts, Portland.

Al J. Laue, Asistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, John R. McCulloch, Jr., Solicitor General, and William F. Gary, Deputy Solicitor General, Salem.

Before Joseph, Chief Judge, and Thornton and Richardson, Judges.

THORNTON, J.

## THORNTON, J.

Petitioner appeals from the Board of Podiatry Examiners' order revoking his license to practice podiatry and refusing to renew it for subsequent years. Petitioner makes seven assignments of error, three of which we combine for analytical convenience.

1-3) The Board erred in finding that petitioner's treatment of patient Brittner constituted both gross negligence and repeated negligence;

4) The Board abused its discretion in permanently depriving petitioner of the opportunity to practice podiatry in Oregon because the sanction was disproportionate to the seriousness of his misconduct;

5) The Board exceeded its statutory authority in promulgating a rule which defines the statutory term "unprofessional or dishonest conduct" as "gross or repeated negligence" and "conduct or practice contrary to the recognized standards of the podiatry profession";

6) The Board failed to articulate its reasoning leading from its findings of fact to its conclusion that the conduct constituted both gross and repeated negligence; and

7) The Board violated its own rule in revoking the license because petitioner's conduct at most would subject him to suspension of the license for six months.

The Board entered detailed findings of fact and conclusions of law. It also entered findings of ultimate fact around which we structure our discussion. Petitioner does not dispute the particular findings of fact; indeed, he concedes his conduct amounted to malpractice. His principal contention is that his conduct boils down to a single act of negligence, *i.e.,* failure to properly diagnose the severity of the patient's infection, and that, therefore, the ineffectiveness of his treatment and the particular aspects thereof which the Board found negligent were only products of this misdiagnosis.[1]

---

[1] Charges involving other patients were heard simultaneously with those discussed, but they were dismissed by the Board in light of *Megdal v. Board of Dental Examiners,* 288 Or 293, 605 P2d 273 (1980), decided after the referee's hearing in this case.

Petitioner is a specialist in ambulatory foot surgery, and a large part of his practice consists of outpatient treatment. On May 27, 1976, he removed bunions from both feet of his patient Brittner through surgery performed in his office. He treated the patient for a week at her home and thereafter in his office through October 25, 1976. Over the course of that period the patient developed osteomyelitis (an infection causing deterioration of the bone) and, finally, after consulting a second podiatrist, entered the hospital October 27 and had the diseased bone surgically removed.

## ITEMS OF ALLEGED NEGLIGENCE

### A) Treatment with Antibiotics

The Board concluded that petitioner was negligent both in the types of antibiotics he administered and the amounts. On June 1, he took a culture and sensitivity test of the incision sites, because they were abnormally swollen and were not healing as expected. He immediately administered Kefzol (an antibiotic) in one gram per day doses on seven occasions between June 1 and June 11. The Board concluded, based on the Physician's Desk Reference (30th Edition - 1976), that the dosage was insufficient because three times that much is required to combat a moderate to severe infection in an adult (which the Board found was indicated by the conditions petitioner noted in his chart).

On June 9, the results of the culture and sensitivity test showed that a bacterium called "staph aureus" (the most common cause of osteomyelitis) was responsible for the infection. The report also showed that the bacterium was sensitive to a number of drugs, including Kefzol. Between June 11 and June 16, no antibiotics were given. On June 16, petitioner prescribed Cleosin, to which the cultures showed the bacterium was sensitive, and which the patient apparently continued to take until August 1. Petitioner testified that, after an x-ray taken July 9, he suspected that the infection was osteomyelitis. Expert testimony at the hearing indicated that this was far and away the most probable disease. The Board concluded, first, that because the infection was shown to be sensitive to Kefzol, there was no reason at that point (June 16) to change medication and, second, that Cleosin has potentially severe

side effects (including death) and, according to the accepted practice in Oregon, is not used except in life or death situations. At the time the antibiotic was prescribed, the condition of the patient was not that severe. Other less dangerous drugs to which the staph infection was sensitive were not used.

After August 1, although osteomyelitis was strongly suspected and the tests that were performed indicated no remission of the disease process, petitioner gave no more antibiotics to the patient until October 25, when he again administered one gram of Kefzol. His treatments during this period were mainly topical and prophylactic (*i.e.,* keeping the wounds, which continued to drain and be swollen, clean). The Board concluded that petitioner was negligent in failing to continue antibiotic treatment during this period.

B)   Culture and Sensitivity Testing

Testimony showed that the particular bacterium, staph aureus, has the ability over time to adapt and become desensitized to particular drugs, which tests might show originally would be effective against it. For that reason it is accepted practice when dealing with such an infection to continue to perform culture and sensitivity tests so long as the wound continues to be dehiscent and draining. Other than the initial test on June 1, the record reflects only the one other made on June 16. The Board specifically found that no such tests were performed after July 9 until October 25 and that petitioner was negligent in that respect.

C)   X-Ray Surveillance

Petitioner took x-rays of the patient's feet on June 1, July 9, August 20 and October 25. On June 14, he noted an infection in an area of her feet which had not been operated on, a fact which the Board found to be an indication of the severity of the infection. Under the recognized standards of care in the profession, the Board stated, the proper procedure would have been to take an immediate x-ray to determine whether the infection was affecting the bone and to continue such x-rays, given the tendency of staph aureus to become chronic, on a weekly basis until a month after the symptoms had disappeared. In this respect, x-rays were inadequate.

### D) Patient Supervision

On September 4, the patient requested that petitioner allow her to return to work. On that date modest swelling remained, and the wounds were still dehiscent. Even though petitioner diagnosed the infection as bone disease (by definition, osteomyelitis), and even though he believed that a further operation would be necessary to remove the detached fragments of diseased bone which were observable on the July 9 and August 20 x-rays and he noted symptoms which evidenced the continued presence of the disease, he authorized her to return to work on September 10. The Board found this to be contrary to the recognized standards of podiatry in Oregon.

The Board also found that petitioner had failed over the course of his treatment of the patient to inform her of the seriousness of her condition. He testified that he did so advise her and that she stated that her condition was improving[2] and wished to wait and have the additional surgery performed later. The Board found under the circumstances that, as early as July 9, petitioner should have insisted she enter the hospital or at least remain in bed, and that he did neither. It also concluded that resumption of office visits on June 9 was contraindicated, given the swelling, dehiscence and pain present at that time.

### E) Credibility and Mental State

As mentioned, petitioner admits he misdiagnosed both the nature and severity of the infection. He testified that, once he became aware of the need for surgery to remove the bone fragments, his plan was to wait until the surgical sites had healed before proceeding with further surgery. He also testified that he suggested on both July 9 and August 20 the need for surgery in the immediate future but, in accordance with the desires of the patient to hold off, he did not press the issue. The Board disbelieved this testimony and expressly believed the patient, based on a letter from the referee (none of the Board members was present at the hearing itself) who found her credible. The

---

[2] There is evidence to show that the surgical ulcers were healing of their own accord to some degree. It is not clear from the record, however, whether complete healing could occur in the presence of osteomyelitis.

conclusion was further based on the complete absence in petitioner's charts of any indication that he ever mentioned osteomyelitis or surgery to the patient. The Board stated that its expectation would be to find a notation that the patient had been advised of the consequences of delay.

On October 19, the patient consulted a second podiatrist, who, based on an x-ray and physical examination, diagnosed osteomyelitis which had been active for several months, given the amount of bone deterioration. He did not immediately inform the patient of this because, he stated, he did not want to treat the patient without first talking to petitioner, who was out of town at the time. He did call the other podiatrist who shares space with petitioner, and who had seen the patient on a couple of occasions, and was told that they were waiting for further healing of the surgical ulcers before proceeding with surgery.

On October 25, this podiatrist talked to petitioner and informed him of his diagnosis and that he believed aggressive treatment would be needed to counteract the disease. Petitioner took another x-ray on that date, which revealed the same state of affairs upon which the other's diagnosis had been based. The Board found that, even then, petitioner did not apprise the patient of the seriousness of her condition, a conclusion which is inferable from the fact that the second podiatrist performed corrective surgery two days later. Petitioner's chart notes of October 25 contain the statement that the second podiatrist "stated he told her very little." The latter also testified that when he took over the care of the patient, he asked petitioner for his records and x-rays and told him he wanted to help him. Petitioner refused to give these records to the second podiatrist and replied, "No, you're not here to help me. You're here to help my patient." The Board viewed these remarks as indicative of petitioner's overall mental state with regard to treatment of this particular patient.

We consider first petitioner's fifth assignment of error — that the Board exceeded its authority in defining "unprofessional conduct" to include "gross or repeated negligence" and practices "contrary to the recognized standards of the podiatry profession." OAR 682-10-020(2) and (3).

ORS 682.110 provides:

"The board, after due hearing, may refuse to grant or reregister and may suspend or revoke any license issued under this chapter to a person, otherwise qualified, who:

"(1) Obtained such license by fraudulent representations or dishonesty in taking an examination.

"(2) Is convicted of a felony, or of a misdeameanor involving moral turpitude.

"(3) Has knowingly made false and deceptive statements in advertising.

"(4) Has conducted business in an unprofessional or dishonest manner.

"(5) Is addicted to liquor, drugs or controlled substances to such a decree as to render the person unfit to practice.

"(6) Wilfully or repeatedly violates any of the provisions of ORS chapter 682 or the rules of the board."

Petitioner's attack on the rule is two-pronged: 1) expansion of "unprofessional conduct" in subsection (4) to include negligent acts is, under the principle of *ejusdem generis,* beyond the scope of the statutory delegation because all the other subsections would permit revocation of a podiatrist's license only for *intentional* misconduct; and 2) promulgation of subsection (3) of OAR 682-10-020 ("contrary to the recognized standards of the podiatry profession") sets up a "grab-bag" or a "catchall clause that is as general as the standard it purports to elucidate," citing *Megdal v. Board of Dental Examiners,* 288 Or 293, 314, 605 P2d 273 (1980).

As *Megdal* and *Springfield Education Assn. v. School Dist.,* 290 Or 217, 230, 621 P2d 547 (1981), make clear, the term "unprofessional conduct" is, in the parlance of *Springfield,* a "delegative term" by which the legislature delegated to the agency the authority to complete otherwise incomplete legislation in accordance with the general purposes of the act "* * * because it cannot foresee all the situations to which the legislation is to be applied and deems it operationally preferable to give to an agency [that authority] * * *." 290 Or at 228. In reviewing agency rules formulated under such terms, it is this court's function to determine "whether the rule remains within the intended

scope and purpose of the delegated authority." *Megdal v. Board of Dental Examiners, supra,* 288 Or at 314.

■    ORS 682.010(3) defines "podiatry" as "* * * the diagnosis or the medical, physical or surgical treatment of ailments of the human foot * * *." The practice of podiatry is elsewhere characterized as a "profession," *e.g.,* ORS 682.070(2). It seems obvious that "unprofessional conduct" would include misconduct in the course of diagnosis and treatment of foot ailments, the subject of the present controversy. Otherwise, since the remaining subsections involve conduct not directly related to the medical aspects of professional practice, the Board would have no authority to revoke a license for misconduct which goes to the very competence of the licensee to practice in the profession. Petitioner does not really contend otherwise.[3] It should be noted that *Megdal,* which he seems to argue is controlling in this case, is very different on its facts. In that case, the court held that a dentist's license could not be revoked for fraudulent misrepresentations made to his malpractice insurer that certain dentists employed by him were practicing in Oregon when in fact they were practicing in California. Such conduct fell somewhere on a spectrum defined by the licensee's private affairs on the one hand and "conduct in the course of rendering the professional service" on the other. 288 Or at 314-15. Because the Board had not stated by rule that fraud in the management of the business affairs of a dental practice constituted "unprofessional conduct," the licensee had no notice that such conduct might expose him to revocation of his license; so there was no legal ground to revoke it. 288 Or at 321.

■    Contrary to petitioner's contention, we conclude that the Board was not precluded under the doctrine of *ejusdem generis* from defining "unprofessional conduct" to

---

[3] Petitioner does argue that, since the statute refers to the conduct of *business* in an unprofessional manner, the legislature intended to restrict the Board's authority to revoke only to instances of conduct involving the operational aspects of a podiatry practice *(e.g.,* billing, insurance, etc.). At first blush, this contention seems frivolous for the reasons stated in the text. Assuming this position is arguable from the wording of the statute, the Board was nevertheless entitled to read the provision to include professional misfeasance, and the rules promulgated clearly include such misconduct. We consider the Board's interpretation to be consistent with the intended legislative purposes.

include gross or repeated negligence. That doctrine is an aid to statutory construction:

> "* * * where general words follow the enumeration of specific classes of things, the general words are to be construed as restricted to things of the same type as those specifically enumerated. * * *" *Skinner v. Keeley,* 47 Or App 751, 757, 615 P2d 382 (1980).

First, we do not agree that the doctrine applies here, because the use of the term "unprofessional" in ORS 682.110(4) does not appear to be intended as a general term encompassing the other prohibitions (fraud in obtaining license, conviction of a felony, false advertising, etc.). *Cf. Hodges v. Real Estate Div.,* 40 Or App 243, 247, 594 P2d 1286 (1979). Even assuming the doctrine would apply in this instance, it is not apparent that the common thread running through the list of offenses for which a license may be revoked is that of intent. There are a number of felonies which require a mental state short of actual intent, and we would find it difficult to state categorically that all alcohol and drug addiction which would render a person unfit to practice is the product of intent, at least in the same sense that fraudulent representations in advertising are. We conclude therefore that the Board acted within the scope of its legislatively delegated authority in adopting a rule that gross or repeated negligence constitutes a ground for revocation of licenses.

■ We turn now to petitioner's first three assignments of error. There is an initial problem with the Board's "Conclusions of Law." The first conclusion states that petitioner's "post-operative care" of the patient constituted "repeated negligence." The second finds that petitioner's "treatment of [the] patient * * * *as a whole* indicated his conscious and wilful indifference" to the standards of the profession. The third holds petitioner grossly negligent in failing to warn the patient of the need for immediate surgery and hospitalization, which failure demonstrated "conscious and wilful indifference * * * to the rights of his patient * * *." The Board is invested with a large measure of discretion in charging and imposing sanctions, but, where a particular sanction is predicated on three separate grounds, each ground must be justified in the evidence before that sanction may be upheld on appeal, even though

any one alone would provide a basis therefor. *Palen v. State Bd. Higher Education,* 18 Or App 442, 463, 525 P2d 1047, *rev den* (1974). By corollary, an agency is not permitted to permute a single act of misconduct into two or more by affixing different labels to the act. *See Jensen v. Bd. of Dental Examiners,* 53 Or App 50, 630 P2d 912 (1981), in which we stated:

"* * * The Board concluded that petitioner was guilty of eight violations, four against each patient, for 'lewd advances,' 'lascivious advances,' 'improper advances' and 'lewd, lascivious and improper advances.' * * * '[L]ewd' and 'lascivious' are synonymous and both may be considered 'improper.' The evidence supports only two violations. * * *" 53 Or App at 913.

We have no problem with the distinction drawn by the Board between petitioner's treatment of the patient and his failure to adequately warn her of the seriousness of her condition even after he was informed of the second podiatrist's diagnosis. The Board found that each separately amounted to gross negligence. The difficulty stems from the relationship between the findings that the *treatment* constituted repeated negligence and also gross negligence. Arguably, the Board merely applied two labels to the same conduct.

"Repeated negligence" requires, by definition, more than one act or omission (and, in this sense, the order here is on a different footing than the one in *Jensen,* which involved two distinct episodes with different patients). The various acts and omissions may be related or entirely unrelated. Viewed together, they may bespeak an attitude of carelessness or a general level of incompetence which renders the licensee unfit to practice, but they may not in sum rise to the level of gross negligence.

"Gross negligence," as the term is generally used, connotes an act beyond mere inadvertence or error in judgment; it must be error "of such magnitude or recurrence" that a wilful indifference to the consequences of the act may be inferred. *Hambleton v. Bd. of Engineering Examiners,* 40 Or App 9, 12, 594 P2d 416 (1979); *Stacey v. Board of Accountancy,* 26 Or App 541, 544-45, 553 P2d 1074, *rev den* (1976). We have held this to be a sufficiently definite standard, although, confessedly, the line between

negligence and gross negligence in a particular case may be difficult to draw. *See Voelz v. Bd. of Engineering Examiners,* 37 Or App 113, 116, 586 P2d 807 (1978), *rev den* (1979). Under the Administrative Procedures Act, that line-drawing function is left to the agency's expertise; our review is confined to ascertaining whether it applied the proper legal standard and whether there was substantial evidence to support its factual conclusions. ORS 183.482(8)(a) and (c).

■ The Board's finding of repeated negligence is supported by the evidence. Petitioner contends his conduct manifests a single act of negligence (misdiagnosis) which prompted a series of erroneous treatments. The evidence supports the findings that he failed to track the progress of the post-operative infection by proper x-rays and culture and sensitivity testing and that he administered antibiotics in inappropriate amounts over an inadequate period of time to counteract the infection. He prescribed an antibiotic (Cleosin) with potentially fatal side effects. Between July 9 and October 25, petitioner took one x-ray and no cultures. It is not clear from the record why he did not continue to check on the progress of the infection, which was visibly present, even if his plan were to wait until the surgical ulcers had healed before attempting to remove the bone fragments which were a product of that infection. In short, the Board could well have concluded that several aspects of petitioner's treatment were negligent independently of the correctness of his original diagnosis. Further, this is not a case where the harmful results follow immediately from the negligent diagnosis *(e.g.,* amputation of a leg). The disease and signs thereof developed over a period during which petitioner saw the patient a number of times. His failure over time to appreciate the error of his initial conclusions was viewed by the Board as negligent and would support a finding of repeated negligence.

■ The evidence would also support the inference that petitioner acted with "wilful and conscious indifference" in treating the patient. The validity of the inference of *gross* negligence depends largely on how obvious the errors petitioner committed should have been to a reasonable podiatrist. Clearly, the evidence supports the finding of gross negligence set out in the Board's third conclusion.

To say that the evidence *would* support conclusions of repeated negligence and gross negligence does not resolve the problem entirely. The Board could have found particular aspects of petitioner's treatment so negligent in *magnitude* as to amount to conscious indifference to applicable standards. Where, however, gross negligence is sought to be established by *recurrent* negligent acts or omissions, the standard becomes virtually identical to "repeated negligence." Potentially, the Board could find that petitioner's failure to appreciate his misdiagnosis and consequent erroneous treatment despite repeated contraindications was so divergent from the standard of care expected of practioners that it could only be explained by inferring a wilful indifference to the improvement of the patient. If this is the Board's view, the order fails to adequately articulate it. The "opinion" portion of the order deals entirely with petitioner's representations and mismanagement of the patient, not particular aspects of the treatment itself.

The Board concluded that petitioner's conduct, *taken as a whole,* constituted gross negligence. Absent an explanation of which particular aspects of treatment were grossly negligent or how the multiple acts of negligence add up to a mental state of wilful indifference, it appears that the Board improperly labeled petitioner's treatment *in toto* as both repeated and gross negligence. We must therefore remand the case to the Board for articulation of the bases for inferring wilful indifference from acts of repeated negligence and reconsideration of the sanction.

For similar reasons, we are unable to determine from the Board's order whether its conclusion that petitioner was consciously and wilfully indifferent to the standards of the profession is independent of the conclusions relating to repeated negligence and gross negligence, or represents nothing more than redundant alternative nomenclature to the words "repeated negligence" and/or "gross negligence." *Cf. Jensen v. Bd. of Dental Examiners, supra.* On remand, the Board should clarify that point and should take the clarification into account in its reconsideration of the sanction. Because we remand, we need not decide at this time whether OAR 682-10-020(3), defining "unprofessional conduct" to include practices contrary to

the recognized standards of the profession, could survive scrutiny under *Megdal v. Board of Dental Examiners, supra.*

With respect to petitioner's sixth assignment of error, we find the Board's explanation of its findings and conclusions ample for meaningful judicial review except as specified above. *McCann v. OLCC,* 27 Or App 487, 498, 556 P2d 973 (1976), *rev den* (1977). Both the probability and seriousness of osteomyelitis and the inadequacy of petitioner's treatment of it were well-documented. The professional standards petitioner was charged with violating are specifically articulated in the findings of fact. *Cf. Spray v. Bd. of Medical Examiners,* 50 Or App 311, 321, 624 P2d 125 (modified on reconsideration on a separate point, 51 Or App 773, 627 P2d 25), *rev den* 291 Or 117 (1981). This order is a far cry from those reviewed in other cases in which evidence was recited followed by bald conclusions couched in the language of the legal standard to be applied without referring one to the other. *See Home Plate, Inc. v. OLCC,* 20 Or App 188, 530 P2d 862 (1975); *Stalder v. Bd. of Medical Examiners,* 37 Or App 853, 588 P2d 659 (1978).

Because we remand for reconsideration of the sanction, we need not consider petitioner's contention that the sanction imposed was too severe.

Reversed and remanded.