Daniel M. DUNCAN, Jack D. Gillum
and GCE International, Inc.,
Appellants,

v.

MISSOURI BOARD FOR ARCHITECTS,
PROFESSIONAL ENGINEERS AND
LAND SURVEYORS, Respondent.

No. 52655.

Missouri Court of Appeals,
Eastern District, Division Three.

Jan. 26, 1988.

Lawrence B. Grebel, St. Louis, for appellants.

Curtis F. Thompson, Jefferson City, for respondent.

SMITH, Judge.

On July 17, 1981, the second and fourth floor walkways of the Hyatt Regency Hotel in Kansas City collapsed and fell to the floor of the main lobby. Approximately 1500 to 2000 people were in the lobby. The walkways together weighed 142,000 pounds. One hundred and fourteen people died and at least 186 were injured. In terms of loss of life and injuries, the National Bureau of Standards concluded this was the most devastating structural collapse ever to take place in this country. That Bureau conducted an investigation of the tragedy and made its report in May 1982.[1] In February 1984, the Missouri Board for Architects, Professional Engineers and Land Surveyors filed its complaint seeking a determination that the engineering certificates of registration of Daniel Duncan and Jack Gillum and the engineering certificate of authority of G.C.E. International were subject to discipline pursuant to Sec. 327.441 RSMo 1978. The Commission, after hearing, found that such certificates were subject to suspension or revocation. Upon remand for assessment of appropriate disciplinary action, the Board ordered all three certificates revoked. Upon appeal the trial court affirmed. We do likewise.

G.C.E. is a Missouri corporation holding a certificate of authority to perform professional engineering services in Missouri. Gillum is a practicing structural engineer holding a license to practice professional engineering in Missouri. He is president of G.C.E. Duncan is a practicing structural engineer holding a license to practice professional engineering in Missouri and is an employee of G.C.E.

Gillum-Colaco, Inc., a Texas corporation, contracted with the architects of the Hyatt construction to perform structural engineering services in connection with the erection of that building. By subcontract the responsibility for performing all of such engineering services was assumed by G.C.E. The structural engineer, G.C.E., was part of the "Design Team" which also included the architect, and mechanical and electrical engineers.[2] Gillum was identified pursuant to Sec. 327.401.2(2) RSMo 1978, as the individual personally in charge of and supervisory of professional engineering activities of G.C.E. in Missouri. His professional seal was utilized on structural engineering plans for the Hyatt. Duncan was the project engineer for the Hyatt construction in direct charge of the actual structural engineering work on the project. He was under the direct supervision of Gillum.

The Commission conducted twenty-seven days of hearing. Its "Statement of the case, Findings of Fact, Conclusions of Law and Decision" are 442 pages in length. Ninety-eight of those comprise findings of fact; 322 pages constitute the Commission's conclusions of law. The Commission made 180 numbered findings of fact, many containing multiple findings within the same number. Appellants have, in brief and at oral argument, challenged only five of those findings. One of the disputed findings is in fact a conclusion of law which we ignore as a finding of fact. At oral argument we requested identification of the specific facts in each finding which are disputed. To one finding there was no specificity given and our review indicates each fact statement therein is supported by evidence of record. One finding was objected to largely as a matter of degree of

1. The Bureau report was an exhibit in the hearing.

2. The owner selected the architect who in turn selected the engineers. Members of the design team are normally not selected by bids; they are compensated by a fixed fee for services rendered based upon hours or work performed. G.C.E.'s total fee for the Hyatt was $247,500.

the facts stated. We find factual support for the findings therein engrafting thereon a limited scope compatible with the evidence. The specific facts challenged in the two remaining findings we find to have evidentiary support. We therefore review the decision of the Commission on the basis that the remaining 175 findings are factually supported by the record, and that four of the challenged findings are supported by the record.

Duncan was found to have been guilty of gross negligence in the preparation and completion of a structural drawing (S405.1, Sections 10 and 11); and in failing to review shop drawings of the Hyatt project (in particular Shop Drawing 30 and Erection drawing E3). He was further found guilty of misconduct in misrepresenting to the architects the safety of a connection (the double hanger rod-box beam connection) when he was ignorant of the safety due to a failure to perform engineering tests and calculations to determine such safety. Gillum was found vicariously liable and responsible for the acts and omissions of Duncan which liability and responsibility he assumed by affixing his professional engineering seal on the structural drawings. Sec. 327.411, RSMo 1978. He was further found grossly negligent in failing to himself review or assure that someone had reviewed drawing S405.1 before affixing his seal thereto. Gillum was also found to have engaged in unprofessional conduct in failing and refusing to take responsibility for the entire engineering project as, the Commission concluded, is required by Sec. 327.411.2, RSMo 1978. Finally, Gillum was found guilty of misconduct for his failure to perform a review of the Hyatt atrium design following specific request by the architect for such review, and for continuing misrepresentations to the owner and architect concerning such atrium design review. G.C.E. was found vicariously liable and responsible for the acts and·omissions of Duncan and Gillum.

We will not attempt to set forth in detail the extensive evidence before the Commission. Some review of that evidence is, however, required. The atrium of the Hyatt was located between the 40 story tower section of the hotel and the function block. Connecting the tower and function block were three walkways, suspended from the atrium ceiling above the atrium lobby. The fourth floor walkway was positioned directly above the second floor walkway. The third floor walkway was to the east of the other two walkways. As originally designed the fourth and second floor walkways were to be supported by what is referred to as a "one rod" design. This consisted of six one and one quarter inch steel rods, three on each side, connected to the atrium roof and running down through the two walkways. Under this design each walkway would receive its support from the steel rods and the second floor walkway would not be supported by the fourth floor walkway. At each junction of the rods and the walkways was a box beam-hanger rod connection. These were steel to steel connections and the design of such connections is an engineering function, because the design includes the performance of engineering calculations to determine the adequacy of the connection to carry the loads for which it is designed.

Connections are basically of three kinds, simple, complex, and special. All connections are the responsibility of the structural engineer. Simple connections are those which have no unusual loads or forces. They may be designed by looking up the design in the American Institute of Steel Construction (AISC) Manual of Steel Construction and following directions found therein. This can be done by a steel fabricator utilizing non-engineering personnel. Complex connections are those where extreme or unusual loads are exerted upon the connection or where the loads are transferred to the connection from several directions. These connections cannot be designed from the AISC manual and require engineering expertise to design.

Special connections are a hybrid having characteristics of each of the other two. A simple connection becomes special where concentrated loads are placed thereon and the AISC manual no longer provides all the information necessary to properly design the connection. Such connections may also

become special where the connections are "non-redundant." A "redundant" connection is one where failure of the connection will not cause failure of the entire system because the loads will be carried by other connections. A "non-redundant" connection which fails will cause collapse of the structure. The box beam-hanger rod connections were "non-redundant." The Commission found the box beam-hanger rod connections to be special connections.

The steel fabricator on the Hyatt project, Havens Steel Company, had engineers capable of designing simple, complex, or special connections. The structural engineer on a project may, as a matter of custom, elect to have connections designed by the fabricator. To do this, he communicates this information to the fabricator by the manner in which he portrays the connection · on his structural drawings. The adequacy of the connection design remains the responsibility of the structural engineer. The Commission found that the structural drawings (S405.1 Secs. 10 and 11) did not communicate to the fabricator that it was to design the box beam-hanger rod connection, and did communicate to the fabricator that those connections had been designed by the engineer. Duncan testified that he intended for the fabricator to design the connections. Havens prepared its shop drawings on the basis that the connections shown on the design drawings had been designed by the structural engineer. Certain information concerning loads and other aspects of the box beam-hanger rod connections which appeared on Duncan's preliminary sketches was not included on the final structural drawings sent to the fabricator. The Commission also found that Duncan's structural drawings did not reflect the need for a special weld, did not reflect the need for stiffeners and bearing plates, and reflected that the hanger rods should be of regular strength steel rather than high strength. These factual findings are not contested. The hanger rods and the box beam-hanger rod connections shown on the structural drawings did not meet the design specifications of the Kansas City Building Code. That finding of fact by the Commission is also not contested.

Because of certain fabricating problems Havens proposed to Duncan the use of a "double rod" system to suspend the second and fourth floor walkways. Under this system the original six rods would be connected only to the fourth floor walkway. A second set of rods would then connect the second floor walkway to the fourth floor walkway. The effect of this change was to double the load on the fourth floor walkway and the box beam-hanger rod connections on that walkway. There was evidence that one of the architects contacted Duncan to verify that the double rod arrangement was structurally sound and was advised by Duncan that it was. Appellants dispute that the architect's testimony clearly establishes such an inquiry and contend that the conversation dealt rather with the aesthetic nature of the change. Our review of the record causes us to conclude that the architect did testify to receiving assurances that the new design was structurally safe. It is difficult to understand why the architect would consult the structural engineer if his only concern was the aesthetics of the new design. The Commission further found that the records of G.C.E. failed to contain a record of a web shear calculation which Duncan testified he made and which would normally be a part of the G.C.E. records. Duncan's testimony reflected the need for such a calculation before approval of the double rod arrangement. The Commission also found certain additional necessary tests or calculations were not made. Appellants do not challenge that finding. It is a reasonable inference from the evidence that Duncan did not make the engineering calculations and tests necessary to determine the structural soundness of the double rod design.

Havens prepared the shop drawings of the structural steel fabrication. These drawings were returned to Duncan for review and approval. They contained the fabrication of the box beam-hanger rod connections based upon the structural drawings previously submitted by Duncan and bearing the seal of Gillum. The Commission found, and appellants do not dispute, that its own internal procedures

called for a detailed check of all special connections. The primary reason for such a procedure is to provide assurance for the owner that the fabricator is conforming to the contract and that any engineering work conforms to acceptable standards. A technician employed by G.C.E. checked the sizes and materials of the structural members for compliance with design drawings. He called to Duncan's attention questions concerning the strength of the rods and the change from one rod to two. Duncan stated to the technician that the change to two rods was "basically the same as the one rod concept." Duncan did not "review" the fourth floor box beam connection shown on the Havens shop drawings nor did he, in accord with usual engineering practice, assemble its components to determine what the connection looked like in detail. The Commission found, again not disputed, that appellants did not review the shop drawings for compliance of the box beam-hanger rod connection with design specifications of the Kansas City Building Code; did not review the shop drawings for conformance with the design concept as required by the contract of G.C.E. and the specifications on the Hyatt project nor for compliance with the information given in the contract documents. Duncan and Gillum approved the shop drawings.

While construction of the Hyatt was in progress the atrium roof collapsed. Investigation into that collapse established that the cause was poor construction workmanship. During the course of their investigation of the atrium roof collapse, appellants discovered that they had made certain errors in their design drawings and that they had failed to find discrepancies in their review of shop drawings involving the atrium. These errors and discrepancies were in areas other than the walkway design. The owner and architect directed G.C.E., for an additional fee, to check the design of the entire atrium. G.C.E. undertook that review. Gillum assured the owner's representative that "he would personally look at every connection in the hotel." Appellants were also specifically requested by the construction manager to inspect the steel in the bridges including the connections.

Duncan subsequently advised him that had been done. In their report to the architects, appellants advised "we then checked the suspended bridges and found them to be satisfactory." This report was a culmination of a design check of the "structural steel framing in the atrium as per the request of Crown Center [the owner]." Appellants did not do a complete check of the design of all steel in the atrium nor a complete check of the suspended bridges. Gillum reviewed the report prepared by Duncan and took no exception. At a meeting with the owner and architect, Gillum stated that his company had "run a detailed, thorough re-analysis of all of the structure. And to determine if there was any other areas that were critical or had any kind of a design deficiency or detail deficiency." Duncan reported at that meeting: "We went back, myself and another engineer, and checked all the atrium steel.... Everything in the atrium checked out very well [with one non-relevant exception]." Appellants checked only the atrium roof steel.

Approximately a year after completion of the Hyatt Regency the second and fourth floor walkways collapsed. The cause of the walkway collapse was the failure of the fourth floor box beam-hanger rod connections.

█ Appellants have raised numerous points on appeal. Some pertain to all appellants and some to Duncan or Gillum individually. Some general discussion of the law as it pertains to this licensing disciplinary procedure is necessary. First, however, we must deal with appellants' challenge to the constitutionality of the licensing statute, Sec. 327.441 RSMo 1978. If that challenge is substantial and has been properly preserved, exclusive jurisdiction is vested in the Missouri Supreme Court. Mo. Const., Art. V, Sec. 3.

Specifically the appellants challenge subparagraph (2)(d) of Sec. 327.441 (now Sec. 327.441.2(5) RSMo 1986) on the basis that the term "gross negligence" is so vague as to deny appellants their due process rights under the Fifth and Fourteenth Amendments to the United States Constitution.

The trial court struck the allegations of unconstitutional vagueness in the petition for review on the basis that the constitutional issue had not been raised at the first opportunity before the Commission. If the issue has been properly raised and if it is an issue of substance and not merely colorable then jurisdiction vests in the Supreme Court.

In order to preserve a constitutional issue for review it must be raised at the first available opportunity. *City of St. Louis v. Butler*, 358 Mo. 1221, 219 S.W.2d 372 (banc 1949) [5, 6]. When that opportunity arises depends on the facts and circumstances of each individual case. *Appeal of Mac Sales Co.*, 256 S.W.2d 783 (Mo.1953) [1, 2]. The reason behind the "first opportunity" rule is:

> "A party may not wait until he has lost the case and then, in contravention of a statute and the Constitution itself and to the cluttering up and confusion of the Courts, pick and choose his appellate forum by a belated constitutional question dragged by its very heels into the case." *Deiner v. Sutermeister*, 266 Mo. 505, 178 S.W. 757 (1915). [2].

■ The reason for the rule logically suggests that raising the constitutional challenge is to permit a ruling on the constitutional issue by the body before whom the matter is pending. Administrative agencies lack the jurisdiction to determine the constitutionality of statutory enactments. *City of Joplin v. Industrial Commission of Missouri*, 329 S.W.2d 687 (Mo. banc 1959) [1]. Raising the constitutionality of a statute before such a body is to present to it an issue it has no authority to decide. The law does not require the doing of a useless and futile act. *State Savings Assoc. of St. Louis v. Kellogg*, 52 Mo. 583 (1873) l.c. 591. We see no logical reason to require that a constitutional challenge to the validity of a statute be raised before an administrative body in order to preserve the issue for appellate review [3] In *Schierding v. Missouri Dental Board*, 705

S.W.2d 484 (Mo.App.1985) [4] we indicated in dicta that a litigant before an administrative body "may, indeed should" raise his constitutional challenge before that body. We did not hold there, however, that failure to do so constituted a failure to preserve, only that raising it would clearly serve to preserve it.

■ In any event, the record before us does not support the contention that the issue was not raised. The purpose of the rule is to bring to the attention of the tribunal the constitutional objection. It is clear from the conclusions of law of the Commission that it was fully cognizant of the constitutional challenge to the vagueness of the statute. We find the constitutional question is properly before us and the trial court erred in striking those portions of the petition for review alleging it.

■ We now turn to the question of whether the challenge is substantial or merely colorable. If the latter, jurisdiction does not vest in the Supreme Court. *Magenheim v. Board of Education*, 340 S.W.2d 619 (Mo.1960) [1]. Vagueness of a statute is determined by a two part analysis. The statute must define the proscribed conduct with sufficient definiteness that ordinary people can discern what acts are prohibited and the offensive conduct must be defined in a manner which does not encourage arbitrary and discriminatory application. *Vetter v. King*, 691 S.W.2d 255 (Mo. banc 1985) [1]. Impossible standards of specificity are not required. *Ferguson Police Officers v. City of Ferguson*, 670 S.W.2d 921 (Mo.App.1984) [9]. The crucial aspect is that the legislature establish minimal guidelines to govern law enforcement or, in this case, licensing discipline. *Vetter v. King, supra.* The purpose behind licensing statutes is to protect the public rather than to punish the licensed professional. *State ex rel. Lentine v. State Board of Health*, 334 Mo. 220, 65 S.W.2d 943 (1933) [7–11]. In the licensing context our courts

---

**3.** We note in this connection the distinction between a constitutionally infirm statute and the unconstitutional application of a statute. The logic of the rule does not apply to the latter situation where the administrative body has the authority to apply the statute in a constitutional manner.

have upheld statutes containing such undefined terms as "unprofessional and dishonorable conduct," "bad moral character," and "misconduct or dishonesty." *Id.* [4–6]; *Holmes v. Missouri Dental Board,* 703 S.W.2d 11 (Mo.App.1985) [1]. The use of such general terms does not render the statute so uncertain, vague or ambiguous as to be unenforceable. *Lentine, supra,* [4–6]. It is indeed impossible to define or categorize all the acts which might constitute terms such as "unprofessional conduct" or "gross negligence." *Ray v. Dept. of Registration,* 94 Ill.App.3d 1123, 50 Ill. Dec. 305, 419 N.E.2d 413 (1981) [2].

 As the Commission noted, the statute leaves the term "gross negligence" undefined and no Missouri court has defined that term within a professional licensing context. Missouri courts do not recognize degrees of negligence and therefore do not distinguish between negligence and gross negligence.[4] *Fowler v. Park Corp.,* 673 S.W.2d 749 (Mo. banc 1984) [7, 8]; *Warner v. Southwestern Bell Telephone Co.,* 428 S.W.2d 596 (Mo.1968) [12–14]. Negligence is defined in Missouri law as the failure to use the degree of care required under the particular circumstances involved. *Kary v. Missouri Highway and Transp. Com'n.,* 687 S.W.2d 692 (Mo.App. 1985) [1, 2]. While the parties are in disagreement as to the correct definition of the term "gross negligence" it is clear that the term connotes an improper conduct greater either in kind or in degree or both than ordinary negligence. It is to be presumed that any licensed professional knows that he is to perform his professional duties with the degree of care required

under the particular circumstances involved, i.e. free from negligence.[5] The statute serves to advise the professional engineer that improper conduct greater in kind or in degree than lack of ordinary care will subject him to disciplinary action. The phrase provides a guideline sufficient to preclude arbitrary and discriminatory application. We are unable to conclude that appellants charge of vagueness of the statute presents a substantial constitutional challenge. It is rather simply another expression of disagreement with the definition of the phrase "gross negligence" utilized by the Commission. *See* discussion, *infra.* We find we have jurisdiction.

Appellants have raised several contentions dealing with the charge and finding that they were guilty of "gross negligence." Initially they challenge the definition of that phrase adopted by the Commission. As previously indicated Missouri courts have not defined the phrase in a licensing context. In other jurisdictions two basic approaches have emerged. In the first the phrase has been held to delineate a difference in degree from ordinary negligence. As stated in Prosser, The Law of Torts, 4th Ed. p. 183–184:

"... most courts consider that 'gross negligence' ... differs from ordinary negligence only in degree, and not in kind ... that it signifies more than ordinary inadvertence or inattention, but less than conscious indifference to consequences; and that it is merely an extreme departure from the ordinary standard of care."

---

**4.** While the courts have not recognized degrees of negligence in dealing with the common law, the General Assembly has not found itself so restricted, particularly in the licensing area. *See,* Sec. 326.130.2(5) (Accountants); Sec. 328.-150.2(5) (Barbers); Sec. 329.140.2(5) (Cosmetologists, Hairdressers and Manicurists); Sec. 330.-160.2(5) (Podiatrists); Sec. 331.060.2(5) (Chiropractors); Sec. 333.121.2(5) (Embalmers and Funeral Directors); Sec. 334.100.2(5) (Physicians and Surgeons, Physical Therapists); Sec. 335.066.2(5) (Nurses); Sec. 337.035.2(5) (Psychologists and Professional Counselors); Sec. 338.055.2(5) (Pharmacists); Sec. 340.145.2(5) (Veterinarians); Sec. 345.065.2(5) (Speech Pathologists and Clinical Audiologists); Sec. 346.-

105.2(5) (Hearing Aid Fitters and Dealers); Sec. 374.755.1(5) (Insurance).

The term has also been used in non-licensing contexts. *See,* Sec. 260.480.3; Sec. 260.545(3); Sec. 304.155.2; Sec. 304.157.2; Sec. 375.041.3; Sec. 537.037.1(1); Sec. 537.348(1); Sec. 559.021.-3; Sec. 577.031; Sec. 632.440.

**5.** We are unaware of any constitutional restriction which would preclude the Missouri legislature from authorizing disciplinary sanctions upon a professional for negligent conduct. That it has chosen not to do so does not equate to an authorization to act negligently.

This approach has been adopted by some courts. *See Wright v. State Board of Engineering Examiners*, 250 N.W.2d 412 (Iowa 1977) [2]; *Vivian v. Examining Board of Architects, etc.*, 61 Wis.2d 627, 213 N.W.2d 359 (1974) [4].

A second category of cases define .the term within the framework that "gross negligence" differs from ordinary negligence in kind not degree. Those courts view gross negligence as a conduct of such magnitude or reoccurrence as to infer, or indicate, or cause a presumption that the actor is indifferent to his obligations, to the probable consequences of his act or acts, and to the rights of others. *Voelz v. Board of Engineering Examiners*, 30 Or. App. 889, 568 P.2d 700 (1977) [3]; *Hambleton v. Board of Engineering Examiners*, 40 Or.App. 9, 594 P.2d 416 (1979) [1, 2]; *Britton v. Board of Podiatry Examiners*, 53 Or.App. 544, 632 P.2d 1273 (1981) [3]. One court has viewed such negligence as "such a want of care and regard for the rights of others as to justify the presumption of willfulness and wantonness in such as implies disregard of consequences or willingness to inflict injury." *Hatfield v. New Mexico State Board of Registration for Professional Engineers and Land Surveyors*, 60 N.M. 242, 290 P.2d 1077 (1955) l.c. 1079.

▌ The Commission rejected the definition utilized in the first category of cases (difference in degree) and utilized a definition recognizing that gross negligence is different in kind from ordinary negligence. Appellants do not disagree with this selection of category. The Commission defined the phrase in the licensing context as "an act or course of conduct which demonstrates a conscious indifference to a professional duty." This definition, the Commission found, requires at least some inferred mental state, which inference may arise from the conduct of the licensee in light of all surrounding circumstances. Appellants have posited a definition purportedly differ-

ent that would define the phrase as "reckless conduct done with knowledge that there is a strong probability of harm, and indifference as to that likely harm." We are not persuaded that the two definitions are in fact different. An act which demonstrates a conscious indifference to a professional duty would appear to be a reckless act or more seriously a willful and wanton abrogation of professional responsibility.[6] The very nature of the obligations and responsibility of a professional engineer would appear to make evident to him the probability of harm from his conscious indifference to professional duty and conscious indifference includes indifference to the harm as well as to the duty. The structural engineer's duty is to determine that the structural plans which he designs or approves will provide structural safety because if they do not a strong probability of harm exists. Indifference to the duty is indifference to the harm. We find no error in the definition utilized by the Commission. It imposes discipline for more than mere inadvertence and requires a finding that the conduct is so egregious as to warrant an inference of a mental state unacceptable in a professional engineer.

▌ The appellants also challenge the Commission's findings that each of several different acts or omissions constituted gross negligence justifying discipline. These findings were apparently made by the Commission in an abundance of caution for in a footnote it recognized that "it is only after a complete analysis of their overall performance within the system that any judgment of their conduct can be made under the terms of the licensing statute." This is clearly true. It is the combination of a series of acts and omissions which created the structurally unsound walkways. Any one of those acts or omissions alone might well not have compromised the structural integrity of the walkways if the series of acts and omissions had not existed

6. Sec. 562.016.4 RSMo 1986, defines "reckless" in the criminal context as when a person "disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow and such disregard constitutes a gross deviation

from the standard of care which a reasonable person would exercise in the situation." We do not note any substantial difference between that definition and the Commission definition of gross negligence, except the latter is shorter.

in combination.[7] For the Commission to require a finding that each of these acts or omissions had to be grossly negligent to support discipline (if in fact the Commission so required) would place upon the Board a greater burden than was required. It is apparent, however, that the Commission found the overall conduct of appellants grossly negligent and if that finding is supported by competent and substantial evidence we are bound by it.

*Hermel, Inc. v. State Tax Commission,* 564 S.W.2d 888 (Mo. banc 1978) [1]; 536.-140.2 RSMo 1978.

■ Appellants in this connection challenge one of the Commission's findings on the basis that the collapse of the walkways was not caused by a certain specific failure. This is raised in connection with the finding that the failure to delineate special strength steel for the rods was grossly negligent. The rods themselves did not fail. In making this assertion appellants rely on the elements of a common law cause of action for negligence, i.e.; duty, breach, proximate causation, and injury or damage. They assert that proximate causation is not present. In the first place we are not dealing with a civil cause of action for negligence. We are dealing instead with a determination of whether appellants negligently breached their duty in the design of the walkways. That breach occurred at the latest when their design was incorporated into the building with their approval and they were subject to discipline whether or not any collapse subsequently occurred. It is the appellants conscious disregard of their duty for which discipline is being imposed not the result of that breach. *State ex rel. Lentine v. State Board of Health, supra.* Damage or injury is not an element of this disciplinary proceeding and proximate cause is the legal concept that authorizes civil recovery for damage resulting from negligence. It is not in and of itself an aspect of "negligence," only an aspect of a civil cause of action for negligence. Related to that concept is the fact that indeed there was dam-

age caused by the breach. By statute and under the contract the owner of the building was entitled to a building structurally safe and sound. *The Mayor and City Council of City of Columbus, Mississippi v. Clark–Dietz and Associates–Engineers, Inc.,* 550 F.Supp. 610 (D.C.Miss.1982) [5, 6]. The owner did not receive such a building because of appellants' breach of their professional responsibility. The owner received a defective building. Whether the walkways collapsed or not, the owner was damaged because it received less than it was entitled to and that damage was proximately caused by appellants' acts and omissions. Further we have previously stated that gross negligence is not required in each act of appellants; it is their overall conduct in regard to the Hyatt construction which justifies discipline.

In connection with some of appellants' contentions it is necessary to review the statutory provisions concerning professional engineers and their certifications. Chapter 327, RSMo 1978 (applicable to this proceeding) regulates architects, professional engineers, and land surveyors. Sections 327.181 through 327.261 deal specifically with the certification of professional engineers. Sections 327.381 through 327.481 are general provisions applying to all three professions and include the disciplinary provisions. Section 327.181 defines the practice of a professional engineer as the rendering or offering of service or creative work,

> "the adequate performance of which requires engineering education, training, and experience in the application of special knowledge of the mathematical, physical, and engineering sciences to such services or creative work as ... planning and design of engineering works and systems, ... and the inspection of construction for the purpose of assuring compliance with drawings and specifications, any of which embraces such service or work either public or private, in connection with any ... structures, buildings ... or projects...."

---

7. For instance, the original inadequacies of the structural drawings might not have been critical

if a meaningful review of the shop drawings had occurred.

Section 327.191 prohibits the unauthorized practice of the profession. That section contains certain exceptions two of which have some relevance to appellants' contentions on appeal. One exempts employees of certificated engineers who perform engineering work "under the direction and continuing supervision of and is checked by" a certificated engineer. Another exempts a person engaged in engineering who is a full-time, regular employee of a person "engaged in manufacturing operations and which engineering so performed by said person relates to the manufacture, sale or installation of the products of such person." This exception would appear to apply to a layman or an engineer employed by a steel fabricator. Sec. 327.-201 provides a misdemeanor penalty for unauthorized practice of professional engineering which includes affixing an engineer's own seal on "any plans, specifications, drawings or reports which have not been prepared by him or under his immediate personal supervision."

Section 327.401 provides that the right to engage in the profession "shall be deemed a personal right, based upon the qualifications of the individual ..." Gillum asserts this provision negates vicarious liability. That section also provides that a registered engineer may practice as a member of a partnership or corporation as long as the engineering documents of the business organization are signed and stamped with the personal seal of the registered engineer by whom or under whose personal direction the same were prepared. The engineer affixing "his signature and personal seal to any such plans, specifications, estimates, plats, reports or other documents or instruments shall be personally and *professionally* responsible therefor." (Emphasis supplied). The reference to "professionally responsible" obviously refers to the engineer's certificate. Corporations may practice engineering upon obtaining a certifi-

cate if its directors have assigned responsibility for proper conduct of its professional engineering to a professional engineer registered in Missouri.

Section 327.411 deals specifically with the seal of the professional engineer. It requires each engineer to have one and to affix it to "all plans, specifications, estimates, plats, reports, surveys and other documents or instruments prepared by him, or under his direction, *and he shall be held personally responsible for the contents of all such documents.*" (Emphasis supplied).[8] The seal is further stated to be the "legal equivalent of his signature whenever and wherever used." That section then provides:

> "[T]he owner of the seal shall be responsible for the whole ... engineering project ... when he places his personal seal on any plans, specifications, estimates, plats, reports, surveys or other documents or instruments for or to be used in connection with any ... engineering project ... unless he shall attach a statement over his signature, authenticated by his personal seal, specifying the particular plans, specifications, plats, reports, surveys or other documents or instruments intended to be authenticated by the seal, and disclaiming any responsibility for all other plans, specifications, estimates, reports, or other documents or instruments relating to or intended to be used for any part or parts of the ... engineering project...."

By the contract with the owner of the Hyatt, appellants agreed to provide the architect and owner "all structural engineering services" for the Hyatt construction. No other individual or entity was to provide such services and the architect (and therefore the owner) were never informed that anyone else would do any structural engineering on the project.

The statutory provisions make clear that Missouri has established a strin-

---

**8.** The statutory responsibility imposed by utilization of a seal is not unique to Missouri. *See Merrill v. Board of Architect Examiners,* 71 Or. App. 636, 693 P.2d 1317 (1985); *Ambassador Baptist Church v. Seabreeze Heating and Cooling Co.,* 28 Mich.App. 424, 184 N.W.2d 568 (1970);

*Llewellyn v. Iowa State Commerce Commission,* 200 N.W.2d 881 (Iowa 1972); *Hutchinson v. Dubeau,* 161 Ga.App. 65, 289 S.E.2d 4 (1982); *South Dakota Building Authority v. Geiger-Berger Associates,* 414 N.W.2d 15 (S.D.1987).

gent set of requirements for professional engineers practicing in the state. The thrust of those requirements is professional accountability by a specific individual certified engineer. These requirements establish the public policy of the state for the protection of the public. They require that plans for construction of structures in this state which require engineering expertise be prepared by or under the direct supervision of a specified certified engineer and that that engineer bear personal and professional responsibility for those plans. The affixing of his seal on the plans makes him responsible for the entire engineering project and all documents connected therewith unless he specifically disclaims responsibility for some document relating to or intended to be used for *any* part of the engineering project. It would be difficult to imagine statutory language more clearly evidencing the total responsibility imposed upon the engineer, and accepted by him when he contracts to provide his services. The statutory statement that the right to engage in the profession is a personal right based upon the individual's qualifications in no way impacts upon the responsibilities imposed upon an engineer. Rather the assessment of the individual "qualifications" of the engineer include his willingness and ability to accept the responsibilities imposed on him by the statutes.

The statutory level of responsibility impacts directly on several contentions of respondents. Of greatest importance are the contentions concerning "custom" within the profession and the imposition of "vicarious" liability on Gillum and G.C.E.

As to "custom", appellants assert that reliance upon fabricators to design certain structural steel connections is the custom and practice within the profession and appellants' reliance thereon is not negligence. The thrust of Duncan and Gillum's defense was that it was expected by them, in keeping with custom and practice, that Havens would design the connections and they are not and should not be responsible for Haven's failures or the errors in Haven's shop drawings or design.[9] The law in this state is clearly stated in *State ex inf. Ashcroft v. Riley*, 590 S.W.2d 903 (Mo. banc 1979) [3, 4] (quoting from two other cases):

> "Where established customs and practices are challenged and found to run counter to plain and unambiguous language of controlling regulatory statutes such customs and practices must give way to the law, which this Court must declare as it is and not as some would prefer that it had been written.... It is self-evident that a custom or usage repugnant to the express provision of a statute is void."

If as a matter of public policy it is desirable that project structural engineers be authorized to rely upon connections requiring engineering expertise designed by certified or non-certified engineers, or laymen, employed by a fabricator having neither contractual nor statutory responsibility for the structural engineering of the project, the legislature can so provide. State ex inf. *Danforth v. Dale Curteman, Inc.*, 480 S.W.2d 848 (Mo.1972) [5]. It has not done so and we have no authority, nor inclina-

---

9. Gillum's testimony included the following:
 "Q. Do you consider that seal to make you responsible for shop drawings subsequently prepared by a licensed professional engineer registered in the State of Missouri employed by a steel fabricator?
 A. No, sir.
 Q. Why not?
 A. Because the shop drawings that were prepared under the direction of another engineer have to be the responsibility of the other engineer. They were not prepared under my direction and therefore I cannot accept that responsibility...."
 Q. Mr. Gillum, do you consider the seal you placed on your drawing relating to your structural engineering design made you responsible for this later drawing prepared by somebody else on behalf of the steel fabricator?
 A. No, sir.
 Q. Why not, sir?
 A. First of all, the employees of the companies that prepared that were not under my personal direction, and therefore I had no authority over these employees, and without authority and ability to direct them in how they are preparing that drawing, I cannot accept the responsibility for anything that they do."

tion, to establish a public policy contrary to that established by the General Assembly.

■ Design of connections is, on the facts of this record, a matter requiring engineering expertise. The statute imposes on the project engineer the responsibility for the design of such connections whether he in fact designs them himself or not. The statute specifically exempts from certification, and therefore from the rigors of licensing and Board discipline, employees of steel fabricators. Given the rigorous responsibilities imposed on engineers by the statute it is inconceivable that the legislature contemplated relieving certified engineers of responsibility for engineering decisions made by non-certified engineers or laymen. Design of connections is, under the statute, a matter for which the engineer is responsible. Custom, practice, or "bottom line" necessity cannot alter that responsibility. *State on Inf. McKittrick v. Williams*, 346 Mo. 1003, 144 S.W.2d 98 (banc 1940) [18–20]. Evidence of such matters is simply irrelevant in defense of the charges here. *Huang v. Garner*, 157 Cal. App.3d 404, 203 Cal.Rptr. 800 (1984) Fnt. 9, [13, 14]; *Henry v. Britt*, 220 So.2d 917 (Fla.App.1969) [9].

■ Appellants have challenged the findings of the Commission on the basis that the hypothetical questions posed to three expert witnesses were improper as containing facts not supported by the record and as requiring the experts to resolve disputed issues of fact. The alleged inadequacy of the hypothetical question, it is contended, is a fatal flaw to the Commission findings that appellants failed to follow acceptable engineering practice on the Hyatt project. This, it is argued, creates an absence of evidence to support the findings of gross negligence and misconduct. In reviewing that issue it must be in the context of the statutory requirements for engineers, not in the context of engineering custom or practice. The need for expert testimony as to "acceptable engineering practice" is not the same under the two contexts. There was abundant evidence concerning the conduct of Duncan and Gillum and that that conduct did not meet the professional requirements of the statutes. In view of the statutory mandate and the Building Code, expert testimony concerning "acceptable engineering practices" was unnecessary.

■ Gillum and G.C.E. have challenged the imposition of "vicarious" liability for the failures of Duncan. Not all of the charges found against Gillum are based upon Duncan's failings but relate also to Gillum's own acts or omissions. However, some of the conduct for which Gillum was disciplined, and all of the conduct of G.C.E. for which discipline was imposed, arose under a "vicarious" liability theory. "Vicarious liability" has been defined as "based on a relationship between the parties, irrespective of participation, either by act or omission, of the one vicariously liable, under which it has been determined as a matter of policy that one person should be liable for the act of the other. Its true basis is largely one of public or social policy under which it has been determined that, irrespective of fault, a party should be held to respond for the acts of another." *Nadeau v. Melin*, 260 Minn. 369, 110 N.W.2d 29 (1961) [3]. Such responsibility can be imposed either by common law or by statute. Prosser on Torts, 5th Ed., p. 511; *Gardenvillage Realty Corporation v. Russo*, 34 Md.App. 25, 366 A.2d 101 (1976) [6, 7].

The public policy of this state as it pertains to the responsibility of engineers has been established by the General Assembly in Chapter 327. That Chapter imposes upon the engineer a non-delegable duty of responsibility for projects to which he affixes his seal. *Johnson v. Salem Title Company*, 246 Or. 409, 425 P.2d 519 (banc 1967); *Mayor etc. v. Clark–Dietz etc., supra* [3, 4]; *State Board of Registration for Pro. Eng. v. Rogers*, 239 Miss. 35, 120 So.2d 772 (1960) [1].

Gillum relies upon a series of cases dealing with disciplinary proceedings against real estate brokers to support his contention that he cannot be disciplined for the gross negligence of Duncan. *See Davis v. Real Estate Commission*, 211 S.W.2d 737 (Mo.App.1948); *Dittmeier v. Real Estate*

*Commission,* 237 S.W.2d 201 (Mo.App. 1951) affd. 316 S.W.2d 1 (Mo. banc 1958); *Moore v. Commonwealth State Real Estate Commission,* 9 Pa.Commw. 506, 309 A.2d 77 (1973); *Kunst v. Dept. of State, New York,* 41 App.Div.2d 686, 342 N.Y.S. 2d 636 (1973); *O'Horo v. Ohio Real Estate Commission,* 4 Ohio App.2d 75, 211 N.E.2d 200 (1964). He also relies on that portion of Sec. 327.401 providing that the right to engage in the profession of engineering "shall be deemed a personal right, based upon the qualifications of the individual." That provision, it is contended, obviates discipline based upon vicarious liability. We have already addressed that contention.

In *Davis v. Real Estate Commission, supra* [2–4] the court stated:

"The rule of *respondeat superior,* under which civil liability upon the master for the acts of an employee is imposed, is not applicable when it comes to the imposition of a penalty or forfeiture. *Unless the statute imposing a penalty expresses a contrary intent* an employer will be held liable in such cases only in case of some culpable fault or omission on his part." (Emphasis supplied).

The purpose of disciplinary action against licensed professionals is not the infliction of punishment, but rather the protection of the public. *State ex rel. Lentine v. State Board of Health, supra.* Chapter 327 has established the responsibility a certified engineer bears when he undertakes a contract in his professional capacity. Sec. 327.191 authorizes non-certificated engineers to perform engineering work "under the direction and continuing supervision of and is checked by" a certificated engineer. It is a misdemeanor for a certified engineer to affix his seal to plans which have not been prepared "by him or under his immediate personal supervision." Sec. 327.201. A corporation may engage in engineering activities if it has assigned *responsibility* for proper conduct of its professional engineering to a registered professional engineer. Sec. 327.401. Gillum was the engi-

neer designated by G.C.E. as having that responsibility. An engineer affixing his seal to plans is personally and professionally responsible therefor. Sec. 327.401. Affixing his seal to plans imposes upon the engineer responsibility for the *whole* engineering project unless he, under seal, disclaims such responsibility. Gillum made no such disclaimer here. The entire thrust of Chapter 327 is to place individual personal and professional responsibility upon a known and identified certificated engineer. This is the responsibility the engineer assumes in exchange for the right to practice his profession. It is the assumption of this responsibility for which he is compensated. The statutory framework is established to protect the public and to hold responsible licensed engineers who fail to afford that protection. It is clear that the statute expresses the intent to impose disciplinary sanctions on the engineer responsible for the project whether the improper conduct is that of himself or attributable to the employees or others upon whom he relies. This case differs, therefore, from the cases relied upon by Gillum and G.C.E. where the statute did not impose such non-delegable responsibility. The Commission did not err in finding that Gillum and G.C.E. were subject to discipline for the acts or omissions of Duncan.

■ Appellants also attack the findings of the Commission on the basis that they were found guilty of offenses not charged or alleged in the complaint.[10]

Section 327.441.2(5) authorizes a complaint to be filed against an engineer with the Commission on the basis of "incompetency, misconduct, gross negligence, fraud, misrepresentation or dishonesty in the performance of the functions or duties" of his profession. The complaint filed with the Commission must set forth "the cause or causes for which his certificate of registration or authority should be suspended or revoked." The purpose of the complaint is to inform the accused of the nature of the

**10.** The hearing was held on the First Amended Complaint as expanded by the Second Amended Complaint. The latter document was filed during the hearing and served to add charges con-

cerning the third-floor walkway to those in the First Amended Complaint which involved the second and fourth floor walkways. Appellants raise no issue concerning the time of filing.

charges so that he can adequately prepare his defense. Charges in the complaint need not meet the specificity of a criminal indictment. *Giessow v. Litz*, 558 S.W.2d 742 (Mo.App.1977) [10–12].

The specificity of charges could be at essentially three levels. The most general is simply a statement that the accused has violated one or more of the statutory grounds for discipline without further elaboration, i.e., he has been grossly negligent. Such an allegation is insufficient to allow preparation of a viable defense. The second level involves a greater specificity in setting forth the course of conduct deemed to establish the statutory ground for discipline. The third level involves a degree of specificity setting forth each specific individual act or omission comprising the course of conduct. Due process requires no more than compliance with the second level. *Langlitz v. Board of Registration of Chiropractors*, 396 Mass. 374, 486 N.E. 2d 48 (1985) [6, 7].

The complaint here met that requirement. It set forth the general statutory grounds for discipline of gross negligence, misconduct, etc. and then in a series of specific allegations the course of conduct which each appellant engaged in which demonstrated gross negligence, incompetence, misconduct, or unprofessional conduct.[11] With one exception the findings of the Commission were responsive to the allegations of the complaint. They were not couched in the same language as the complaint because they addressed the misconduct in greater detail than did the complaint. But the conduct found to warrant discipline was encompassed in the allegations of the complaint.

Gillum contends vicarious liability was not charged. The petition did not state specifically that Gillum was being charged for Duncan's failings. But it did recite the acts or omissions upon which Duncan's gross negligence was based. It also charged Gillum with failure "to supervise or otherwise monitor employees under his

direct supervision or control." As we have heretofore stated Gillum's responsibility flowed as a matter of law from the acts or omissions of Duncan. The acts or omissions upon which Gillum's responsibility rested were therefore adequately charged. The same is true of the other contentions of Gillum attacking the findings of the Commission which premised discipline upon conduct contrary to Gillum's statutory obligations. The evidence established the acts of misconduct or gross negligence charged in the complaint and from these flowed his statutory violations as a matter of law.

The one exception is the finding of the Commission that Gillum was guilty of misconduct in failing to perform a required review of the atrium design and in misrepresenting that his company had done so. While this finding is fully supported by the evidence we do not find it contained even by inference in either of the two complaints upon which the hearing was held. The second amended complaint was filed during the hearing and after testimonial reference to the atrium collapse but did not allege any ground for discipline based on the review of the atrium design. We cannot assume this charge of misconduct was tried by consent as a ground for discipline. The doctrine of amendment to conform to the proof is applied to disciplinary proceedings with great caution. *In re Voorhees*, 739 S.W.2d 178 (Mo. banc 1987) [11]. The evidence was relevant to establish the mental elements of gross negligence as defined by the Commission. In that posture we are unable to conclude that its admission was for the purpose of establishing a separate unpleaded ground for discipline. *Standard Title Insurance Company v. Roberts*, 349 F.2d 613 (8th Cir.1965) [1, 2]. We therefore hold that that finding of misconduct cannot stand.

We now turn to the sufficiency of the evidence to support the Commission's findings that discipline was warranted. In so doing we note again the concession of appellants that except for five findings the

---

**11.** As an example—one of the charges against Gillum stated: He failed to design and/or detail a box beam-hanger rod connection for use in the continuous single rod system that was within the design specifications of the Kansas City Building Code.

findings of fact of the Commission are supported by evidence. We have previously stated our analysis of the five disputed findings. We review the sufficiency within the legal principles and framework heretofore explicated.

We look first to Duncan. He was the project engineer for the Hyatt and as such had primary responsibility within his company for designing and approving those aspects of the Hyatt which required structural engineering expertise. The design of the connections in the walkways and the design of the walkways themselves were included in that responsibility. The walkways were intended to carry pedestrian traffic. They were suspended above the main lobby of the hotel, recognized to be the main point of congregation within the hotel. The walkways each weighed approximately 35 tons and were comprised of heavy and largely non-malleable materials such as steel, concrete, glass and wood. The connections in the walkway were non-redundant so that if any one within a single walkway failed they all would fail and the walkway would collapse. Duncan had never designed a system similar to the Hyatt walkways. It is self-evident that the walkways offered a potential of great danger to human life if defectively designed. The Commission could properly consider the potential of danger in determining the question of gross negligence. That which might constitute inadvertence where no danger exists may well rise to conscious indifference where the potential danger to human life is great. This is simply to say that the level of care required of a professional engineer is directly proportional to the potential for harm arising from his design and as we have previously stated indifference to harm and indifference to duty are closely related if not identical.

The structural drawings of Duncan furnished to the fabricator contained several serious errors. Under standard engineering practice Duncan could either design the box beam-hanger rod connections or cause the drawings to reflect his intention that they be designed by the fabricator. These drawings did neither. They appeared to be connections fully designed by the engineer and were reasonably so interpreted by the fabricator. Duncan testified that he intended the fabricator to design the connections. The drawings did not contain information indicating that the connections were to be designed by the fabricator and omitted important engineering load calculations necessary to enable the fabricator to design the connections. The drawings failed to properly identify the type of weld required, the need for bearing plates and/or stiffeners, and erroneously identified the hanger rods as standard rather than high-strength steel. The box beam-hanger rod connections and the hanger rods themselves on all three walkways, as shown by the structural drawings, did not meet the design specifications of the Kansas City Building Code. That Code is intended to provide a required level of safety for buildings within the City. It is difficult to conclude that gross failure to comply with that Code can constitute other than conscious indifference to duty by a structural engineer.

Because of certain difficulties in fabrication Havens requested a change to the double rod configuration. This request was transmitted to Duncan who approved it and verified its structural soundness and safety to the architect. He did so without having conducted all necessary engineering tests and calculations to determine the soundness and safety of the double rod arrangement. His concern was with its architectural acceptability not its structural acceptability. The result of this change was to double the load on the fourth floor walkway and impose a similar increase on the connections which were already substantially below Code requirements.[12]

Havens supplied Duncan with its shop drawings. Under the contract, and under the statute, review and approval of the shop drawings is an engineering function. Appellants normal in-house procedures

---

12. The National Bureau of Standards found as originally designed the connection capacity was 60 percent of that required by the Building Code; as ultimately constructed the capacity was 31 percent of Code requirements.

called for detailed check of all special connections during shop drawing review. Duncan was aware of the change to the two-rod system but did not review the box beam-hanger rod connection on the fourth floor walkway. Duncan did not, as is standard practice, look for an assembled detail of the connection and did not assemble the components, either in his mind or on a sketch, to determine what the connection looked like in detail. The shop drawings did not reflect the use of stiffeners or bearing plates necessary to bring the connections within Code requirements. No review was made nor calculations performed to determine whether the box beam-hanger rod connection shown on the shop drawings met Code requirements. Shop drawing review by the engineer is contractually required, universally accepted and always done as part of the design engineer's responsibility. The box beam-hanger rod connections and the hanger rod shown on the shop drawings did not meet design specifications of the Code.

Following the atrium roof collapse appellants were requested by the architect and owner to recheck all the steel in the atrium. They reported that they had done so and included in that report was the statement "we then checked the suspended bridges and found them to be satisfactory." In fact appellants did not do a complete check of the design of all steel in the atrium and did not do a complete check of the suspended "bridges" i.e. walkways. As finally built, the hanger rods and the box beam hanger rod connections did not meet the requirements of the Code. The walkway collapse was the result of the failure of the fourth floor box rod connections. The third floor walkway, which did not collapse, had a "high probability" of failure during the life of the building.

The determination of conscious indifference to a professional duty, i.e., gross negligence, is a determination of fact. The conduct of Duncan from initial design through shop drawing review and through the subsequent requested connection review following the atrium roof collapse fully supports the Commission's finding of conscious indifference to professional duty.

The responsibility for the structural integrity and safety of the walkway connections was Duncan's and that responsibility was non-delegable. *State Board of Registration for Professional Engineers v. Rogers, supra.* He breached that duty in continuing fashion. His reliance upon others to perform that duty serves as no justification for his indifference to his obligations and responsibility. The findings of the Commission as to Duncan's gross negligence are fully supported by the record.

The Commission also found Duncan subject to discipline for misconduct in misrepresenting to the architects the engineering acceptability of the double rod configuration when he performed no engineering calculations or other engineering activities to support his representation. The Commission found such representation to have been made either knowing of its falsity or without knowledge of the truth or falsity. The Commission found Duncan's misrepresentation to be the willful doing of an act with wrongful intention which it had defined as misconduct. We find no error in either the factual finding or legal conclusion of the Commission. Duncan's representation to the architect concerning a material fact, without a basis for knowledge of its truth or falsity, could properly be viewed as either misconduct as an engineer or gross negligence. In either event it subjected Duncan to disciplinary action.

The Commission found Gillum subject to discipline for gross negligence under the vicarious liability theory and also personally grossly negligent in failing to assure that the Hyatt engineering designs and drawings were structurally sound from an engineering standpoint prior to impressing thereon his seal and in failing to assure adequate shop drawing review. It further found Gillum to be subject to discipline for unprofessional conduct and gross negligence in his refusal to accept his responsibility as mandated by Chapter 327 and his denial that such responsibility existed. All of these findings arise from the same basic attitude of Gillum that the responsibility imposed by Chapter 327 is not in keeping with usual and customary engineering

practices and that that responsibility did not mandate his personal involvement in the design of the Hyatt. In essence he placed the responsibility for the improper design of the connections on Havens and took the position that the structural engineer was entitled to rely on Havens' expertise. What we have heretofore said in regard to the requirements of Chapter 327 and the responsibility imposed upon an engineer thereby sufficiently deals with Gillum's contentions.

His argument here that utilization of his seal without disclaimer could not impose responsibility upon him for the shop drawings of another entity prepared after impression of the seal is clearly rejected by the language of the statute. By section 327.411.2 the owner of the seal is responsible for the "whole ... engineering project" when he places his seal on "any plans" unless he expressly disclaims responsibility and specifies the documents which he disclaims. The shop drawings were part of the documents comprising the engineering project and were "intended to be used for any part or parts of the ... engineering project...." Gillum was by statute responsible for those drawings and he accepted such responsibility when he entered into the contract and utilized his seal. His refusal to accept a responsibility so clearly imposed by the statute manifests both the gross negligence and unprofessional conduct found by the Commission. These findings are further bolstered by the evidence of Gillum's participation in the misrepresentations concerning, and non-performance of, a review of the atrium design upon direct request of the architect and owner. Although we have found that a specific finding of misconduct and discipline therefor cannot be based upon the atrium design review because not charged in the complaint, the evidence is relevant and persuasive on Gillum's overall mental approach to his responsibilities as an engineer and the cavalier attitude he adopted concerning the Hyatt project.

Appellant G.C.E. is, for reasons heretofore stated, subject to discipline for the conduct of its employees and particularly for the conduct of the engineer assigned the responsibility for the "proper conduct of all its ... professional engineering ... in this state...."

The finding of misconduct against Gillum arising from the "atrium design review" is reversed. In all other respects the order of the Commission and the discipline imposed by the Board is affirmed.

KAROHL, P.J., and KELLY, J., concur.