**Gary EDWARDS, Respondent,**

v.

**Lawrence M. GERSTEIN, Charles Klinginsmith, Larry Lovejoy, Lee Richardson, Mary Holyoke, and Charlotte Hill, Appellants.**

**No. WD 73434.**

Missouri Court of Appeals,
Western District.

Jan. 31, 2012.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 28, 2012.

Application for Transfer Denied
May 1, 2012.

See also 85 S.W.3d 10.

156

Cheryl Schuetze, Joel Poole, Jefferson City, MO, for Appellants.

Steven Garner, Joseph Gregg, Springfield, MO, for Respondent.

Before ALOK AHUJA, P.J., JAMES EDWARD WELSH, and CYNTHIA L. MARTIN, JJ.

JAMES EDWARD WELSH, Judge.

Members of the Board of Chiropractic Examiners, Lawrence M. Gerstein, Charles Klinginsmith, Larry Lovejoy, Lee Richardson, Mary Holyoke, and Charlotte Hill, appeal from the circuit court's judgment awarding Dr. Gary Edwards $6,284,759 on his claim for gross negligence. In the suit, Dr. Edwards claimed that the Board members failed to conduct a thorough and impartial investigation before filing a formal complaint against Dr. Edwards's chiropractic license, that the Board members were grossly negligent, and that such gross negligence directly caused or directly contributed to cause damage to Dr. Edwards.

On appeal, the Board members assert six points of error. First, they assert that the circuit court erred in denying their

motion for judgment notwithstanding the verdict because, as a matter of law, they did not owe a duty to Dr. Edwards to conduct a thorough and impartial investigation before filing a complaint against Dr. Edwards's chiropractic license. Second, they contend that the circuit court erred in giving Instruction No. 6, the verdict director, because the definition of "gross negligence" in the instruction misdirected and misled the jury and was a roving commission. Third, the Board members claim that the circuit court erred in excluding evidence that the Administrative Hearing Commission (AHC) found that Dr. Edwards had violated the conduct requirements for chiropractors in section 331.060, RSMo 2000, and that cause existed for the Board to discipline Dr. Edwards's chiropractic license because such evidence was relevant to counter testimony from Dr. Edwards that made reference to the complaint at the AHC. Fourth, they assert that the circuit court erred in excluding evidence that the AHC found that Dr. Edwards had violated the conduct requirements for chiropractors in section 331.060 and that cause existed for the Board to discipline his license because the evidence was relevant to show that Dr. Edwards's damages were caused by the publication of the AHC's findings and not the investigation conducted by the Board. Fifth, they contend that the circuit court erred in repeatedly allowing testimony by the Board members that they had a duty to conduct a fair and impartial investigation because whether such a duty existed was a question of law and not a question of fact for the jury. Finally, the Board members claim that the circuit court erred in admitting evidence of Dr. Edwards's attorney's fees as damages because recovery of such damages was barred by the doctrine of sovereign immunity and because Dr. Edwards's sole remedy for recovery of his attorney's fees was provided by section 536.087, RSMo 2000. We affirm the circuit court's judgment.

Viewing the evidence in the light most favorable to the verdict, the evidence established that Duane Troyer was raised in a Mennonite family. In April 1989, when Duane was twenty-three years old, he learned that he became HIV-positive as a result of a blood transfusion. At the time, Duane was engaged to Regina Hershberger. Duane and Regina were advised by medical personnel that HIV was deadly, incurable, and transmissible through sexual contact. Despite the protests of Regina's family, she married Duane in September of 1989.

Some of the Mennonite families in the community in which Duane was raised tended to disfavor the care provided by medical doctors and preferred chiropractic care. Dr. Edwards provided chiropractic care to some members of the Mennonite community. In April 1990, approximately one year after his HIV diagnosis, Duane sought nutritional counseling from Dr. Edwards. At this time, the only drug available to treat HIV patients was AZT.[1] The only other advice given to HIV patients was to keep the immune system strong through good nutrition in the hope that a cure for AIDS would eventually be found. Duane had been taking AZT, but it made him sick. Several members of the Troyer family received nutritional and chiropractic counseling from Dr. Edwards and recommended Dr. Edwards to Duane.

Nutritional counseling is within the scope of chiropractic practice. When Duane's family asked Dr. Edwards if he

---

1. AZT is the trademark for azidothymidine and is a drug used to delay development of AIDS (acquired immunodeficiency syndrome) in patients with HIV (human immunodeficiency virus).

felt nutritional advice may benefit Duane, Dr. Edwards told them that he would have to research the issue and determine whether it would be safe for Dr. Edwards, his patients, and his staff to treat Duane.[2] After researching the issues, Dr. Edwards determined that casual contact was not a known transmission mechanism. He learned that, aside from AZT, nutritional monitoring was all that was available for HIV patients. Given these findings, Dr. Edwards agreed to see Duane. Dr. Edwards advised the family that the disease was incurable and that Duane should continue treating with medical doctors. Dr. Edwards provided nutritional counseling for two years, with total charges of about $1,200. During Dr. Edwards's treatment and counseling of Duane, Dr. Edwards took a blood sample from Duane and confirmed that he was HIV positive.

While Duane was seeking treatments from Dr. Edwards, Duane's wife became pregnant and gave birth to their daughter in early 1992.[3] After the birth of their daughter, Regina and her daughter tested positive for HIV.[4]

After the birth of his daughter, Duane returned once to Dr. Edwards for treatment. At the time, Duane knew that his wife and child had HIV. On September 5, 1992, Duane died from complications of AIDS.

Years after Duane's death, Regina's mother, Elizabeth Hershberger, wrote Dr. Edwards. She claimed for the first time that Dr. Edwards had told Duane he was cured of HIV and claimed that Regina and Regina's daughter were infected with HIV as a result of their reliance on this assurance. Hershberger threatened Dr. Edwards that, unless he paid her money, she would go to the press. Dr. Edwards refused to pay Hershberger money. Sometime following Hershberger's unsuccessful demand for money from Dr. Edwards, an article appeared in *The Kansas City Star* about Regina and her daughter's having contracted HIV. The article did not mention Dr. Edwards by name but referenced Hershberger's accusations against a chiropractor.

In November 1996, the members of the State Board of Chiropractic Examiners received a memorandum from the Board's Executive Director, bringing to their attention a newspaper article from *The Kansas City Star* that ran on October 20, 1996. This article concerned Dr. Edwards's use of a machine to diagnose Mennonite patients. According to the article, the machine was worthless and could not make a valid diagnosis. The article listed several patients by name that Dr. Edwards had used the machine on and said that several patients were satisfied customers.

The Executive Director's memorandum to the Board also noted that there was another three page article entitled "Modern plague tests a community of faith" that was sent to her with the other article.[5] The article did not mention Dr. Edwards by name. The memorandum noted that whoever sent the articles had made a note on the side of the article that the latter article concerned the same chiropractor—

---

**2.** In the early 1990s, there was little medical knowledge about HIV, which fueled rumors one could contract HIV from another's sneeze, teardrops, or from a toilet seat. Many healthcare providers were unwilling to treat HIV patients.

**3.** The Mennonite faith encouraged large families and prohibited birth control.

**4.** According to Regina, her daughter initially tested positive for HIV, then tested negative, and then tested positive.

**5.** This was an article that ran in the *Kansas City Star* in February 1995.

i.e. Dr. Edwards. The memorandum described the latter article in this way:

> The three page article is about a community of Mennonites where one young male became infected with the AIDS virus from a blood transfusion. The young man was a hemophiliac. The article talks about this young man falling in love with this young woman and about them marrying and having a child. The wife and child were both tested after the birth of the child and both tested positive. Where the chiropractor comes in on this article is before it talks about the couple having a child. Evidently, the couple was practicing "safe sex" and didn't plan on having a family. But a chiropractor had phoned the couple one day and reported that a blood test showed the virus had died. The couple's parents also called the chiropractor and were told "yes, the virus has been eradicated, he's cured." After that the article goes on to say the woman became pregnant and the couple had a daughter. Of course, the man died a couple years after the birth of the child and the woman still has the virus. The child tested negative months after birth.[6]

At the time the Board received the newspaper articles, no complaint had been filed with the Board regarding Dr. Edwards. Following their receipt of the newspaper articles, the Board retained William Burton to investigate the allegations raised in the articles. The Board did not, however, instruct Burton to conduct an unbiased investigation. According to Burton, the purpose of the investigation was to establish that Dr. Edwards had committed the violations. Burton said, "It wasn't my job to establish that he wasn't

doing those things. It was my job to establish that he was doing those things."

Burton's investigation began with speaking to the author of *The Kansas City Star* articles. Burton then met with Regina and her mother, Hershberger. After the meeting, both Regina and her mother filed consumer complaints with the Board against Dr. Edwards. Both Regina and Hershberger alleged that Dr. Edwards acted improperly during his treatment of Duane. The original complaint signed by Hershberger claims that she had a conversation with Dr. Edwards by telephone in 1991 where Dr. Edwards told her he had cured Duane's HIV. When it came to the Board's attention that this would have been *after* Regina became pregnant, the Board had Hershberger "correct" her complaint to claim the conversation occurred in 1990.[7]

Over the next several months, Burton sought to obtain facts necessary to establish the complaints. Burton interviewed several of Dr. Edwards's former employees, one of whom stated she "remembered one time Karla [Edwards (Dr. Edwards's wife)] coming to her and admonishing her not to tell anyone ... that Dr. Edwards either could cure AIDS or had cured AIDS."

Burton also spoke with Regina about the newspaper articles. She told him that she and Duane were engaged when Duane was diagnosed with HIV and that they were married in September 1989. Following medical advice, they used condoms and practiced safe sex so as to prevent Regina from becoming infected. In the winter of 1990, Duane began to not feel well. At the urging of his parents and grandparents, he and Regina went to see Dr. Edwards. At

---

6. The evidence at trial established that the child is HIV positive.

7. At trial, to explain the absence of a phone call to Dr. Edwards in her telephone records, Hershberger claimed that Dr. Edwards had somehow removed the call from her records.

the conclusion of the first visit, Dr. Edwards prescribed several nutritional supplements for Duane.

Regina told Burton that Dr. Edwards said he might be able to cure Duane's HIV, so they went back to him approximately once a month for several months. Regina told Burton that, in August 1990, Dr. Edwards told them that he felt he had eradicated the HIV virus." According to Regina, Dr. Edwards then ordered a blood test.

Regina told Burton that Dr. Edwards told Duane that he was cured of HIV just before Thanksgiving 1990. She reported that Dr. Edwards telephoned them to tell them that Duane's HIV test had come back showing that he was HIV free and that the virus had been eradicated. Finally, she told Burton that Dr. Edwards told them that they could have children.

During his investigation, Burton did not interview or speak with Dr. Edwards. He did not ask Dr. Edwards for his chiropractic records concerning Duane. He did not speak with Dr. Edwards's wife, Karla. He did not request medical records on Duane from Boone Hospital or Audrain Medical Center. He did not speak with Duane's parents. He did not interview any of the other patients of Dr. Edwards who were identified in *The Kansas City Star* articles. He did not request or obtain telephone records from Dr. Edwards or from Hershberger. Burton did not learn, therefore, that Hershberger may have attempted to extort money from Dr. Edwards. Burton did not learn that Dr. Edwards's medical records for Duane contained no indication that he had ever assured Duane that he was cured of HIV and, to the contrary, reflected Dr. Edwards's advice that Duane needed to continue his treatment with medical doctors. Burton did not learn that Duane's other medical records confirmed that Duane knew he remained HIV-posi-

tive from the time of his diagnosis through his death. Burton did not learn that Duane never told his parents that he believed he was cured of HIV or that Duane's parents attended some of Duane's treatments with Dr. Edwards and could testify that Dr. Edwards never claimed that he could cure HIV. Duane's parents would also have advised Burton that Regina never told them while Duane was living that Duane had been cured of HIV. Burton did not learn that Hershberger referred her son for treatment with Dr. Edwards *after* Regina and her infant daughter were infected with HIV, conduct inconsistent with a belief that Dr. Edwards had "caused" Regina and her daughter to contract HIV.

At the conclusion of Burton's investigation, Burton believed that there was probable cause that Dr. Edwards had violated the statutes, rules, and regulations governing chiropractors. He reported his findings to the Board.

In the meantime, both Regina and Hershberger withdrew their complaints and refused to let the Board proceed upon their complaints. They apparently advised the Board that the litigation was incompatible with their church teachings. However, at trial the jury learned that Regina filed a lawsuit against a blood manufacturer and received a sizeable settlement. Thereafter, the Board caused a staff member at the Missouri State Board of Chiropractic Examiners to file a complaint accusing Dr. Edwards of impropriety. The Board thereafter filed its public accusations against Dr. Edwards in May 1998, several months after Regina and Hershberger withdrew their complaint.

The Public Complaint that the Board filed against Dr. Edwards related to Dr. Edwards's supposedly telling Duane he cured him of HIV and causing Duane's family to become infected with HIV. The

complaint was heard by a hearing commissioner, and the parties called witnesses and presented evidence. The matter was then reviewed by this court. We remanded the case for a new hearing. *Edwards v. Missouri State Bd. of Chiropractic Examiners,* 85 S.W.3d 10 (Mo.App.2002). Following remand, the Board dismissed the case against Dr. Edwards, without further hearing.

Dr. Edwards then sued the Board members for gross negligence alleging that they failed to do a thorough and impartial investigation prior to filing the complaint. The circuit court dismissed Dr. Edwards's claims against the Board members after concluding that the Board members were entitled to quasi-judicial immunity. The Missouri Supreme Court, however, reversed the circuit court's dismissal in *Edwards v. Gerstein,* 237 S.W.3d 580 (Mo. banc. 2007) (*"Edwards II"*). The Supreme Court held that section 331.100.5, RSMo 2000, "supersedes common law quasi-judicial immunity and permits suits against the Board for gross negligence." *Id.* at 584. Thus, the court concluded that section 331.100.5 permitted suits against the Board members for gross negligence and remanded the case to the circuit court. *Id.* at 584.

The circuit court held a trial on August 6, 2010 and August 9–13, 2010. On August 13, 2010, the jurors returned a verdict in favor of Dr. Edwards, finding the Board members grossly negligent and awarding Dr. Edwards $6,284,759. The Board members appeal.

In their first point on appeal, the Board members assert that the circuit court erred in denying their motion for judgment notwithstanding the verdict because, as a matter of law, they did not owe a duty to Dr. Edwards to conduct a thorough and impartial investigation before filing a complaint against Dr. Edwards's license. We disagree.

"Because a directed verdict or judgment notwithstanding the verdict should only be granted where the plaintiff fails to make a submissible case, our review is restricted to determining whether the plaintiff made a submissible case." *Kelly v. State Farm Mut. Auto. Ins. Co.,* 218 S.W.3d 517, 520 (Mo.App.2007). "To make a submissible case, a plaintiff must present substantial evidence for every fact essential to liability. Substantial evidence is that which, if true, has probative force upon the issues, and from which the trier of fact can reasonably decide the case." *Blue v. Harrah's N. Kansas City, L.L.C.,* 170 S.W.3d 466, 472 (Mo.App.2005) (citation and internal quotation marks omitted). In reviewing for a submissible case, we accept all evidence and reasonable inferences favorable to the verdict and disregard contrary evidence. *Kelly,* 218 S.W.3d at 521. Further, " '[i]f the denial of a directed verdict or judgment notwithstanding the verdict is based upon a conclusion of law, we review the trial court's decision *de novo.*' " *Id.* (citation omitted). Whether or not a duty exists is a question of law, and we review such questions *de novo. Id.*; *Lumbermens Mut. Cas. Co. v. Thornton,* 92 S.W.3d 259, 266 (Mo.App.2002).

The Board members acknowledge that they may be held personally liable for gross negligence in the performance of their official duties. § 331.100.5, RSMo Cum.Supp.2010. They argue, however, that they owed no duty to Dr. Edwards as a licensee and that their only duty was to protect the public. In support of this contention, they rely on *Bird v. Mo. Bd. of Architects, Prof'l Eng'rs, Prof'l Land Surveyors and Landscape Architects,* 259 S.W.3d 516, (Mo. banc 2008). In that case, the Missouri Supreme Court expressly noted, "[w]hile some financial protection of

licensees may be an effect of professional regulation, the public's protection—*not the licensees'*—is the purpose of professional regulation." *Id.* at 523 (emphasis added). Other Missouri courts have found the same. "License discipline cases are not intended to punish [licensees] for the results of their negligence, but are intended to protect the public." *Moheet v. State Bd. of Registration for the Healing Arts*, 154 S.W.3d 393, 404 (Mo.App.2004). Similarly, in *Gregg v. City of Kansas City*, 272 S.W.3d 353, 362 (Mo.App.2008), this Court stated, with respect to another licensing board, that "[t]he exercise of the Board's duty to investigate applicants and determine whether they qualify for a license requires the use of professional expertise, training, and judgment. The duty to exercise care in that regard is obviously a duty owed to the public at large." Moreover, the Board's regulation, which sets forth its duties with respect to complaints against licensees, states:

> The board interprets this rule, which is required by law, to exist for the benefit of those members of the public who submit complaints to the board and for those persons or entities within the legislative and executive branches of government having supervisory or other responsibilities or control over the professional licensing boards. This rule is not deemed to protect, or inure to the benefit of, those licensees or other persons against whom the board has insti-

tuted or may institute administrative or judicial proceedings concerning possible violations of the provisions of Chapter 331, RSMo.

20 CSR 2070–2.065(8).

While we agree with the Board members that the public's protection is the primary purpose of professional regulation, we do not agree that means that the Board members owe no other duties to anyone else. Indeed, section 331.100.5 recognizes that Board members may be liable for gross negligence in the performance of their official duties. To whom would the Board members be liable for this gross negligence? Only to the public at large? We think not.

In enacting section 331.100.5, the legislature was acknowledging that any person injured by the gross negligence of the Board members was entitled to recover their damages from the Board members. Section 331.100.5 says that "[m]embers of the [Missouri Board of Chiropractic Examiners] shall not be personally liable either jointly or separately for any act or acts committed in the performance of their official duties as board members except gross negligence." As the Missouri Supreme Court found in *Edwards II*,[8] "[t]he plain language of the statute establishes that the Board members are generally immune from suit, with the qualification that immunity is inapplicable if a Board member is grossly

---

**8.** Dr. Edwards points out that, in *Edwards II*, the Missouri Supreme Court found that a cause of action existed against the Board members for their gross negligence. In *Edwards II*, the circuit court dismissed Dr. Edwards's suit after concluding that the Board members were entitled to quasi-judicial immunity, but the Supreme Court reversed that dismissal. *Edwards II*, 237 S.W.3d at 581–82. Dr. Edwards claims that, because the Supreme Court reversed the dismissal, the Supreme Court necessarily found that the Board

members had a legal duty to Dr. Edwards, and, therefore, the doctrine of the law of the case should apply. The Supreme Court, however, merely found that section 331.100.5 "supersedes common law quasi-judicial immunity and permits suits against the Board for gross negligence." *Edwards II*, 237 S.W.3d at 584. The Supreme Court was not asked to consider whether or not the Board members were liable to Dr. Edwards, a licensee, for their gross negligence in the performance of their official duties.

negligent in performing his or her duties." *Edwards II*, 237 S.W.3d at 582. Thus, "[s]ection 331.100.5 supersedes common law quasi-judicial immunity and permits suits against the Board for gross negligence." [9] *Id.* at 584. The fact that the Board's duty runs to the protection of the public and not to the benefit of the licensee may be the philosophical underpinning of immunity for the Board. But, when the legislature specifically qualifies that immunity making the Board members immune for ordinary negligence but not gross negligence, it implicitly creates a duty for the Board members to avoid damaging anyone by such conduct, including a licensee.

■ The Board's regulation, which was in effect at the time of the Board's investigation of Edwards, recognized that the Board has the authority to ask for investigations of complaints when it deems it necessary. Regulation 4 C.S.R. 70–

2.065(6) [10] stated, in part: "The executive committee, composed of the president and secretary, of the board, from time-to-time and as it deems necessary, in consultation with the board's legal counsel and executive director, may direct the office of investigations to investigate any complaint[.]" Thus, the conducting of investigations of complaints was an official duty of the Board, for which Board members could be liable to the licensee if the Board members committed gross negligence in the performance of the investigation. Point I is denied.

In their second point on appeal, the Board members contend that the circuit court erred in giving Instruction No. 6, the verdict director, because the definition of "gross negligence" in the instruction misdirected and mislead the jury and was a roving commission. Though we agree that the definition of gross negligence was likely erroneous, the Board members failed to preserve this claim of error.

9. Judge Laura Denvir Stith wrote separately to concur and dissent in part to the majority's opinion in *Edwards II*. Judge Stith disagreed with the majority that section 331.100.5 abrogated the Board members' "quasi-judicial immunity as it relates to their prosecutorial and quasi-judicial functions" but found that section 331.100.5 waives the board members' immunity associated with official immunity and with the public duty doctrine. *Edwards II*, 237 S.W.3d at 584–85 (Stith, J. concurring). In so concluding, Judge Stith noted that the "public duty doctrine" recognizes that "a public employee's duty normally runs to the public at large rather than to an individual and the public employee therefore cannot be held liable to the individual for injuries arising from a breach of that duty." *Id.* The majority opinion in *Edwards II*, however, does not discuss the public duty doctrine and whether section 331.100.5 waives the board members' immunity associated with the public duty doctrine. The *Edwards II* majority addressed the issue presented by Edwards of whether "section 331.100.5 supersedes quasi-judicial immunity by expressly allowing the members of the Missouri Board of Chiroprac-

tic Examiners to be held liable for gross negligence." *Id.* at 581. In *dicta*, however, the *Edwards II* majority went beyond quasi-judicial immunity and said that section 331.100.5 "supersedes absolute common law immunities and establishes qualified immunity from liability except in cases of gross negligence." *Id.* at 582. The majority noted that both official immunity and quasi-judicial immunity are "common law immunities subject to legislative modification." *Id.*

10. This regulation was in effect at the time the board conducted its investigation of Edwards. This regulation has been renumbered as 20 CSR 2070–2.065. The current regulation no longer contains the quoted provision, but it still recognizes that investigations may be conducted. For example, 20 CSR 2070–2.065(5) instructs that "[t]he complainant shall be informed in writing as to whether the complaint is being investigated." Further 20 CSR 2070–2.065(6) say that "[b]oth the complaint and any information obtained as a result of the investigation shall be considered a closed record and shall not be available for inspection by the general public."

The verdict directing instruction given to the jury in this case stated:

Your verdict must be for plaintiff Gary Edwards if you believe:

FIRST, Defendants failed to conduct a thorough and impartial investigation [11] before filing the formal Complaint against Edwards; and

SECOND, defendants were thereby grossly negligent; and

THIRD, such gross negligence directly caused or directly contributed to cause damage to plaintiff Gary Edwards, unless you believe plaintiff Gary Edwards is not entitled to recover by reason of Instruction 7.

The term "grossly negligent" or "gross negligence" as used in this instruction means a gross deviation from the standard of care that a reasonable Board member would exercise under the circumstances.

 There is no approved MAI instruction concerning the definition of gross negligence. "When there is no applicable MAI instruction, a non-MAI instruction may be given if it conforms to the requirements of Rule 70.02 in that it is simple, brief, impartial and free from argument." *City of Kansas City v. Habelitz*, 857 S.W.2d 299, 303 (Mo.App.1993). In giving a non-MAI instruction, "'the court must adopt an instruction that follows the substantive law and can be readily understood by the jury.'" *Pool v. Farm Bureau Town & Country Ins. Co. of Mo.*, 311 S.W.3d 895, 903 (Mo.App.2010) (citation omitted).

 "'[G]ross negligence' is a term which appears infrequently in appellate de-cisions of this state" because Missouri "has consistently refused to recognize differing degrees of negligence." *Boyer v. Tilzer*, 831 S.W.2d 695, 697 (Mo.App.1992). The Missouri General Assembly, however, has a "penchant" to use the term in the area of professional licensing. *Id.* "Negligence is defined in Missouri law as the failure to use the degree of care required under particular circumstances involved." *Duncan v. Mo. Bd. for Architects, Prof'l Eng'rs and Land Surveyors*, 744 S.W.2d 524, 532 (Mo.App.1988). The term "gross negligence," therefore, "connotes an improper conduct greater in kind or degree or both than ordinary negligence." *Id.*

Thus, in *Boyer*, when considering the definition of "gross negligence," this court's Eastern District accepted a definition used in the licensing context which defined the term as "'an act or course of conduct which demonstrates a conscious indifference to a professional duty.'" *Boyer*, 831 S.W.2d at 698 (quoting *Duncan*, 744 S.W.2d at 533). The court cautioned, however, that "[a]lthough this definition may suffice as a standard by which a professional, familiar with the duties of the profession, judges the conduct of a colleague, we question its adequacy as a standard by which a jury of lay persons may pass judgment upon professional conduct." *Id.* at 698 n. 1.

The *Boyer* court, however, pointed out that the "conscious indifference" definition of gross negligence did not differ materially from another definition of gross negligence, which defined the term as "reckless conduct done with knowledge that there is a strong possibility of harm and indifference as to that likely harm." *Id.* at 698

---

11. We are not sure where the language "thorough and impartial" comes from in paragraph First of the verdict director, and the parties offer no guidance. However, as the Board members have not raised a claim of error based on the verdict director's use of this phrase, we express no opinion about whether the phrase comports with Rule 70.02.

(quoting *Duncan*, 744 S.W.2d at 533). In so concluding, the *Boyer* court found that it was clear that the Court of Appeals in *Duncan* "considered 'conscious indifference to a professional duty' as describing a 'reckless act or more seriously a willful and wanton abrogation of professional responsibility . . . conduct so egregious as to warrant an inference of a mental state unacceptable in a professional[.]" *Id.* (quoting *Duncan*, 744 S.W.2d at 533).

■■■ *Boyer* and *Duncan* instruct that in order to differentiate between an MAI approved definition of negligence,[12] the definition of gross negligence used in a verdict director must incorporate language which captures, in a manner consistent with Rule 70.02, an elevated mental state similar to either conscious indifference or reckless conduct done with knowledge of and indifference to the probability of harm. In this case, the verdict director defines gross negligence as "a gross deviation from the standard of care that a reasonable Board member would exercise under the circumstances." We have no problem with the phrase "deviation from the standard of care that a reasonable Board member would exercise under the circumstances," as the phrase satisfactorily comports with an approved definition of negligence.[13] Other than an acceptable definition of "negligence," all that remains in Dr. Edwards's definition is the word "gross," which appears to have been Dr.

Edwards's effort to require the jury to find an elevated mental state similar to "conscious indifference" or "reckless conduct." The problem, however, is that the word "gross" was used to define the word "gross." It is elementary that a term cannot be defined by using the term itself.

■■ Without a definition of "gross" in this case, each jury member was left to decide for itself what "gross" meant. Arguably, this resulted in the jury receiving a roving commission on their interpretation of a term undefined to them. "A jury instruction is considered a 'roving commission' when it 'fails to advise the jury what acts or omissions of the party would constitute liability, when the instruction is too general, or where the instruction submits a question to the jury in a broad abstract way without any limitation to the facts and the law.'" *Syn, Inc. v. Beebe*, 200 S.W.3d 122, 132 (Mo.App.2006) (quoting *Williams v. Daus*, 114 S.W.3d 351, 371 n. 10 (Mo. App.2003)). Here, barring our ability to conclude that the term "gross" is of such common understanding and meaning that it requires no definition,[14] we would be required to conclude that defining the word "gross" by reference to the word "gross" asked the jury to find "gross negligence" without any limitation to the facts and the law.

■■■ We need not determine, however, whether it was reversible error war-

---

**12.** *See, e.g.,* MAI 11.02 which defines the negligence of an adult as "the failure to use that degree of care that an ordinarily careful person would use under the same or similar circumstances."

**13.** *See* MAI 11.02, referred to in n. 12, *supra,* and MAI 11.06 which defines negligence of a health care provider as "the failure to use that degree of skill or learning ordinarily used under the same or similar circumstances by the members of defendant's profession."

**14.** *See, e.g., Rice v. Bol,* 116 S.W.3d 599, 609 (Mo.App.2003) (quoting *Brock v. Firemens Fund of Am. Ins. Co.,* 637 S.W.2d 824, 827 (Mo.App.1982) ("'Even if not mandated by MAI, however, a trial court must define for the jury legal or technical terms occurring in the instructions, for their meaning is not within the ken of the ordinary juror.'")) However, "while the trial court must define legal or technical terms, it need not define non-technical, readily understood words or commonly used words." *Id.* (citing *MFA Inc. v. Dettler,* 817 S.W.2d 658, 664 (Mo.App.1991)).

ranting a new trial to submit a verdict director which failed to define the word "gross" as the Board members failed to preserve this specific objection to the verdict director. Rule 70.03 addresses the standard for preserving claims of instructional error for appellate review. Rule 70.03 provides:

> Counsel shall make ***specific objections*** to instructions considered erroneous. No party may assign as error the giving or failure to give instructions unless that party objects thereto before the jury retires to consider its verdict, ***stating distinctly the matter objected to and the grounds of the objection.*** Counsel need not repeat objections already made on the record prior to delivery of the instructions. The objections must also be raised in the motion for new trial in accordance with Rule 78.07.

(Emphasis added.) "Proper preservation of error requires that objections be made at the instruction conference and renewed in a motion for new trial." *Syn, Inc.*, 200 S.W.3d at 135. As noted in Rule 70.03, objections must be specific; general objections are not sufficient to preserve error. " 'The rationale behind making objections is to avert error and allow the trial court to make an intelligent ruling.' " *Gill Constr., Inc. v. 18th & Vine Auth.*, 157 S.W.3d 699, 718 (Mo.App.2004) (quoting *Gamble v. Bost*, 901 S.W.2d 182, 188 (Mo. App.1995)). " 'Further, a point of appeal must be based on a theory voiced in the objection at trial and a defendant cannot expand or change on appeal the objection as made.' " *Id.* (quoting *Zakibe v. Ahrens & McCarron, Inc.*, 28 S.W.3d 373, 387 (Mo.App.2000)).

During the instruction conference, the circuit court was presented with four different versions of the verdict director. Three versions, 6A, 6B, and 6C, were tendered (apparently by Dr. Edwards) and rejected. The fourth version was accepted by the circuit court and submitted as Instruction No. 6. The transcript suggests Instruction No. 6 was identical to rejected version 6C with the exception of reference in the submitted instruction to an affirmative converse tendered by the Board members over Dr. Edwards's objection. In accepting the fourth version of the verdict director, the following exchange occurred:

> COURT: All right. All the prior arguments as far as the law and what the law requires are contained in [the Board members'] objections to the instruction. And that will be Instruction No. 6.
>
> [COUNSEL FOR THE BOARD MEMBERS]: Yes, Your Honor. All the defendants' previous objections—roving commission, strict [liability]—all those are included?
>
> COURT: It would be hard not to put all of them in.

Giving the Board members the benefit of the circuit court's sweeping treatment of all objections to any version of the verdict director as objections to Instruction No. 6, we have reviewed the entirety of the transcript from the instruction conference. The discussion, on the record, of the various versions of the verdict director (which is less than a model of clarity) suggests that verdict director 6A was objected to by the Board members because it defined gross negligence as "conscious indifference." [15] The Board members argued this was not the proper definition of gross negligence under *Boyer*, without further explanation.[16] Dr. Edwards included in his

---

**15.** Complicating our review, the record on appeal does not contain Instructions 6A, 6B, and 6C in the form tendered to the circuit court.

**16.** In fact, the objection is confusing, as *Boyer* expressly recognized the propriety of the "conscious indifference" definition of gross negligence. 831 S.W.2d at 698.

appendix an unmarked version of the verdict director which the Board members concede was tendered but rejected. In that version of the verdict director, Dr. Edwards defined gross negligence as "an act or course of conduct which demonstrates a conscious indifference to a professional duty," a definition which is nearly identical to the definition of gross negligence approved in *Duncan*, 744 S.W.2d at 533. As this was not the definition of gross negligence ultimately included in Instruction No. 6, the Board members' objection to the definition of gross negligence included in version 6A is of no relevance to our discussion.[17]

At various other points during the instruction conference, the Board members complained that one or more of the rejected versions of the verdict director were "roving commissions" and that the verdict directors "misstated the legal duty that [the Board members] owed to [Dr. Edwards]." Neither of these objections was tied to the definition of gross negligence or to any particular feature of the verdict director. Even if attributable to the definition of gross negligence, these are not specific objections as they do not state "distinctly the matter objected to and the grounds of the objection" as required by Rule 70.03.

In discussing version 6C, the Board members objected that the verdict director attempted to impose "strict liability," again without tying the objection to the definition of gross negligence or to any other particular feature of the verdict director. As noted above, this was not a specific objection as it did not state "distinctly the matter objected to and the grounds of the objection" as required by Rule 70.03.[18]

Finally, the Board members complained in discussing version 6C that the verdict director "misdefines [sic] gross negligence in terms of a jury instruction." As noted above, version 6C appears to have been identical to the form of verdict director actually submitted with the exception of its added reference to an affirmative converse instruction. Given the circuit court's "incorporation by reference" of previously stated objections, we afford the Board members the benefit of having similarly objected to Instruction No. 6.

The objection that the verdict director "misdefines gross negligence" is not specific. The objection does not state distinctly in what manner the Board members believed the definition to be inaccurate and, for our purposes, certainly did not complain about Dr. Edwards's definition of "gross" by use of the word "gross." In fact, during oral argument of this appeal, the Board members advised this court that

17. At oral arguments, this court requested that the Board members clarify where in the record it objected to the circuit court's definition of gross negligence. After oral arguments, the Board members sent a letter supplementing their response to our question and cited to a portion of the instruction conference where they objected to the definition of gross negligence contained in Instruction No. 6A. As we have noted, Instruction No. 6A's definition of gross negligence was not included in the instruction given, and, thus, the Board members' objection to the definition of gross negligence included in version 6A is not relevant to our discussion.

18. In its Point Relied On, the Board members assert that the instruction given misdirected and misled the jury and was a roving commission because it imposed a standard of strict liability to the Board members' conduct and failed to require the jury to find any facts that would constitute an unfair and impartial investigation. However, at the instruction conference, other than objecting to the instruction on the grounds of "strict liability," the Board members did not state "distinctly the matter objected to" in the instruction.

they had no objection to the use of the phrase "gross deviation" in Instruction No. 6, consistent with the fact that in both their motion for new trial and in their brief on appeal, the Board members tendered an acceptable definition of gross negligence which also included use of the phrase "gross deviation." [19] Indeed, even in a discussion with the court on their motion for a directed verdict after Dr. Edwards's opening statement, the Board members included use of the phrase "gross deviation" in arguing that, in Dr. Edwards's opening statement, Dr. Edwards did not suggest "anything approaching a gross deviation of the standard of care[.]" [20]

We acknowledge that, in arguing their motion for directed verdict, the Board members pointed out to the circuit court what they believed "the theory of the [gross negligence] instruction" would be based upon, given the court's indication "that it's going to give some type of recklessness" instruction.[21] In particular, the Board members argued:

> Under the theory of the instruction and the law that the Court has indicated that it's going to give which is some type of recklessness, our Missouri law says that

"Reckless conduct is conduct done with knowledge that there was a strong possibility of harm and indifference as to that likely harm." A person acts recklessly when the person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow. And such disregard constitutes a gross deviation from the standard of care.

Plaintiff gave no suggestion of anything approaching a gross deviation of the standard of care or reckless conduct in his opening. He said, "Here are the things the Board didn't do. And they've indicated, well, they might have considered that if they would have known of it." But he has not put on the record and established in his opening that this was gross indifference or that it was gross negligence or that it was reckless conduct.

There was no suggestion that the Board acted in such a way that they knew that the probability of harm would occur and that they were indifferent to it.

We do not find, however, that the Board members' argument concerning their directed verdict and Edwards's failure to

19. The Board members, citing a criminal statute, section 562.016.4, RSMo 2000, argue that an acceptable definition of gross negligence would have been when a person "disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation."

20. Further, in arguing their motion for summary judgment, the Board members told the circuit court that "regardless of what definition of gross negligence we ultimately end up with, the Supreme Court has said that a plaintiff must satisfy both the elements of ordinary negligence plus demonstrate the conduct at issue is a gross violation of or deviation from

the accepted standard of care to have gross negligence." Thus, they argued that "in order to prove gross negligence they have to show a gross deviation from the standard of care," which is the definition that was used in Instruction No. 6.

21. This court generously afforded the Board members an opportunity following oral argument to tender those portions of the record other than the instruction conference wherein the Board members preserved a specific objection to the definition of gross negligence contained in the verdict director. The Board members cited their argument on their motion for directed verdict as an example where they objected to "a definition which lacked any element of scienter."

meet his burden during opening statement somehow constitutes a specific objection to Instruction No. 6. Although the circuit court during the instruction conference stated that "all prior arguments as far as the law and what the law requires are contained in [the Board members'] objections"[22] to Instruction No. 6, we do not believe that this meant that the circuit court was suggesting that any arguments or objections made throughout the course of a six-day trial would be preserved regarding Instruction No. 6. The circuit court was merely allowing the Board members to incorporate objections that they had made prior to being on the record for the instruction conference and that they had made on the record during the instruction conference regarding the four proposed gross negligence verdict directing instructions.[23] We find that the Board members' argument on their motion for directed verdict at the conclusion of Edwards's opening statement does not remedy their failure to register specific objections to the definition of gross negligence during the instruction conference as required by Rule 70.03.

The Board members' objection thus failed in any manner to highlight or suggest to the circuit court that by using the word "gross" to define "gross", the definition failed to require the jury to find an elevated mental state similar to "conscious indifference" or to "reckless conduct." We cannot conclude on this record, therefore, that the Board members sustained their burden under Rule 70.03 to register a specific objection to the verdict director's definition of gross negligence that was designed to avert error or to allow the circuit court to make an intelligent ruling. *Gill Constr., Inc.*, 157 S.W.3d at 718.

In addition to arguing that the definition of gross negligence was inaccurate or incomplete, the Board members also argued in their motion for new trial and in their brief on appeal that the definition of gross negligence was erroneous because "Instruction No. 6 further improperly defined the duty the [Board members] owed [Dr. Edwards]" and because the verdict director "failed to require any finding by the jury that [the Board members] did or failed to do any particular act that would constitute gross negligence." The first argument is conceded in the Board members' brief to be a mere recast of the argument we have already disposed of in our discussion of Point I that any duty owed by the Board members is owed to the public and not to Dr. Edwards as a licensee. This argument has nothing to do, of course, with the definition of gross negligence and relates instead to the propriety of submission of the case to the jury in the first instance. The second argument complains that specific acts or omissions were not posited in the verdict director, which is an objection that should have been registered, if at all, to paragraph First of the verdict director.[24] Specific acts or omissions are not typically submitted as a part of a

22. Inclusion by reference into the four corners of the instruction conference of off the record discussions, or of legal arguments otherwise advanced at other times, is not a preferred practice, and exposes a litigant to the risk of failing to preserve a specific objection to an instruction in the manner required by Rule 70.03.

23. The circuit court noted, in regard to Instruction No. 6A, that "prior to being on the record," the Board members "had objections

to [the instruction] which were taken up" and that those objections were "of natures that have been raised throughout the case as legal arguments."

24. *See, e.g.*, MAI 17.02 where specific acts or omissions are submitted to the jury in paragraph First, followed by a required finding in paragraph Second that in so acting or failing to act, the defendant was negligent.

definition. Even the definition of "gross negligence" the Board members deem acceptable would not have submitted specific acts or omissions.

As these additional arguments do not in any manner involve the claimed erroneous definition of gross negligence neither argument preserves anything for appellate review.[25] Point II is denied.

■ In their third and fourth points on appeal, the Board members contend that the circuit court erred in excluding evidence that the AHC found that Dr. Edwards had violated the conduct requirements for chiropractors in section 331.060 and that cause existed for the Board to discipline his license. The Board members assert that such evidence was relevant to counter testimony from Dr. Edwards that made reference to the complaint at the AHC and that the evidence was relevant to show that Dr. Edwards's damages were caused by the publication of the AHC's findings and not the investigation conducted by the Board.

The Board members, however, stipulated that they would not "put into this case the findings of the Administrative Hearing Commission." The parties stipulated that the jury would know that the Board's charges against Dr. Edwards were heard by a hearing commissioner and that both parties called witnesses and presented evidence. Further, they stipulated that the matter was then reviewed by an appellate court and returned for further hearing. Finally, the stipulation acknowledged that the Board dismissed the claim without further hearing. The Board members at trial, through their attorney, stated on the record:

And I will tell the Court I will enter into the stipulation to say we will not stand in front of this jury and tell them the findings of the Administrative Hearing Commission. I have agreed with [Dr. Edwards's attorney] when he approached me that that would be cause for us all to believe that we were going to get into matters that were prejudicial to Dr. Edwards. And I agreed with him. And I think that it would be prejudicial for us to stand here in front of this jury and tell them that he was found guilty on five of the six charges.

■ "[T]he party who stipulates waives his right to advance subsequent contentions contrary to the stipulated facts." *Hagedorn v. Adams,* 854 S.W.2d 470, 477 (Mo.App.1993). The Board members are estopped from contesting that stipulation. Points III and IV denied.

■ In their fifth point on appeal, the Board members contend that the circuit court erred in repeatedly allowing testimony by the Board members that they had a duty to conduct a fair and impartial investigation because whether such a duty existed was a question of law and not a question of fact for the jury. We agree with the Board members that whether or not a duty existed was a question of law. *Lumbermens Mut. Cas. Co.,* 92 S.W.3d at 266. The Board members, however, could testify about their job duties and the foreseeable consequences of their failures to perform their job duties. Indeed, the circuit court made this clear to the jury by instructing the jury before opening statements that:

During the course of opening statements and evidence presented by videotape deposition, you will hear the words

**25.** *See* Rule 84.04(e) which provides that "[t]he argument shall be limited to those errors included in the 'Points Relied On.' "

duties and responsibilities of the members of the Board of Chiropractics. You are to interpret those words, duties and responsibilities, as job duties only. You will hear further instruction from the Court at the conclusion of the case as to the legal duties of the Board of Chiropractors.

Thus, the circuit court did not abuse its discretion in allowing the Board members to testify about their job duties concerning investigating complaints. Point V is denied.

In their sixth point on appeal, the Board members assert that the circuit court erred in admitting evidence of Dr. Edwards's attorney's fees as damages because recovery of such damages is barred by the doctrine of sovereign immunity and because Dr. Edwards's sole remedy for recovery of his attorney's fees was provided by section 536.087. Dr. Edwards's attorney's fees, however, were consequential damages resulting from the Board members' alleged gross negligence which caused Dr. Edwards to be involved in litigation and incur attorney's fees. As previously discussed, section 331.100.5 "supersedes common law quasi-judicial immunity and permits suits against the Board for gross negligence." *Edwards II*, 237 S.W.3d at 584. Dr. Edwards's attorney's fees are the natural and proximate result of the Board members' gross negligence and would be recoverable under section 331.100. Point VI is denied.

We, therefore, affirm the circuit court's judgment awarding Dr. Edwards $6,284,759 on his claim for gross negligence.

All concur.